# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
JUSTIN HEATH THOMAS,
Defendant and Appellant.

S161781

Riverside County Superior Court
RIF086792

January 26, 2023

Justice Cantil-Sakauye* authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Jenkins concurred.

---

*    Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. THOMAS

S161781

Opinion of the Court by Cantil-Sakauye, J.

Defendant Justin Heath Thomas shot and killed Rafael Noriega in Riverside County in September 1992. Defendant was not immediately apprehended. He moved to Texas in 1994 and, less than one year later, stabbed and killed Regina Hartwell. He was convicted in a Texas court of Hartwell's murder and sentenced to life in prison. California law enforcement officials later identified defendant as a suspect in Noriega's death. In 2001, the Riverside County District Attorney filed an information charging defendant with Noriega's murder.

A Riverside County jury subsequently convicted defendant of the first degree murder of Noriega (Pen. Code, § 187, subd. (a)),[1] and found true the special circumstance allegation that the murder was committed while defendant was engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)). In a bifurcated proceeding, the jury also found true the special circumstance allegation that defendant was previously convicted of Hartwell's murder. (§ 190.2, subd. (a)(2).) The jury returned a verdict of death. Defendant moved for modification of his sentence to life without the possibility of parole. (§ 190.4, subd. (e).) The trial court denied the motion

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

and sentenced him to death.  Defendant's appeal is automatic. (§ 1239, subd. (b).)  We affirm the judgment in its entirety.

## I. FACTS AND PROCEDURAL BACKGROUND

## A. Guilt Phase Evidence

### 1. Prosecution evidence

#### a. The killing of Rafael Noriega

In 1992, defendant was involved in distributing crystal methamphetamine in Moreno Valley, California.  He obtained the narcotics from Rafael Noriega and supplied them to Dorothy Lee Brown, who in turn sold the drugs.[2]  Defendant's uncle, Andy Anchondo, managed a ranch outside Moreno Valley. Defendant kept his methamphetamine supply at the ranch and stayed there on occasion.

On September 14, 1992, Noriega received a call on his pager when he was at home.  After Noriega responded to the page, he had a discussion with his roommates Robert Manzano and Michelle Barajas.  Both warned Noriega not to deal with the person who paged him; Manzano suggested that Noriega bring a revolver for protection.  Barajas tried to stop defendant from leaving.  Noriega said he would return, and left.

Defendant planned to meet Noriega in the foothills of Moreno Valley early the following morning.  Defendant drove in

---

[2]      Brown testified during defendant's Texas trial for Hartwell's murder.  Brown was later shot and killed by police during a vehicle pursuit in 2004.  Brown's testimony from the Texas trial was read into the record during defendant's California trial.

a truck with Kelly Smith to the foothills around 3:00 a.m.[3] Brown, driving her own car, met defendant there. Defendant told Brown they were going to meet Noriega. He asked Brown to follow defendant in her car to make sure defendant was not ambushed. On a trail near Anchondo's ranch, defendant told Brown to park and wait; defendant drove further into the foothills. As Brown was waiting, an older couple approached her and told her it was dangerous for her to be there alone. Brown informed the couple she was waiting for her boyfriend and that she would be leaving soon.

After the couple left, Brown exited her car and ran to where defendant had stopped his truck. Brown saw defendant's truck parked behind Noriega's car, with the truck's headlights illuminating the rear of Noriega's car. Brown watched as defendant got out of his truck and yelled something in Spanish. Noriega walked to the back of his car, opened his trunk, and removed a green duffel bag. Defendant picked up a handgun from the seat of his truck and shot at Noriega several times in rapid succession. Brown saw that Noriega had been shot and had fallen to the ground, but she could not tell how many times he had been shot. Brown ran back to her car.

Defendant approached Brown and asked if she heard the gunshots. Brown said she had. Defendant instructed Brown to get out of her car and to follow him back to Noriega's car. Brown saw Noriega lying on the ground and saw Smith drive Noriega's car away. Defendant told Brown to get into his truck, and he

---

[3] An investigator asserted Smith was the individual with defendant, although no independent evidence was presented at trial identifying Smith.

threw Noriega's body into the back of the truck. Brown also saw the green duffel bag in the back of the truck. Defendant ordered Brown to drive. To Brown, it seemed that he was directing her to drive in a large circle. When she stopped, defendant told her she was close to her car. Brown got out of defendant's truck, ran to her own car, and drove home.

About two hours later, defendant arrived at Brown's home, showered and clean-shaven. He returned a broken shovel that he had taken from Brown without her knowledge. He also gave Brown a large amount of methamphetamine and told her that he was going to leave town.

Later that day, three individuals driving in the foothills discovered Noriega's car near Anchondo's ranch. There was a pile of burned debris on the driver's side floorboard and a loaded .22-caliber handgun under the driver's seat.[4]

In mid-October 1992, a group of individuals horseback riding in the foothills discovered Noriega's body near where Noriega's car had been found. The body was positioned facedown in the dirt under a wooden pallet and was in a state of decomposition. Law enforcement officials who responded to the scene believed the pallet had been moved onto the body from a pile of dirt nearby.[5]

---

[4]     Authorities destroyed the gun in August 1996 because it had not been claimed and they were not aware it was connected to the investigation regarding Noriega's killing.

[5]     Officers discovered a .45-caliber bullet casing under Noriega's body, although an investigator opined that the casing did not appear connected to Noriega's death and that it was common for people to fire guns in the area.

Officials at the coroner's office searched Noriega's body and found jewelry, a watch, and a jacket containing four small baggies of methamphetamine. Dr. Robert Ditraglia, the forensic pathologist who performed an autopsy on Noriega's body, described the body as "[s]everely decomposed" and "partially skeletonized." The autopsy revealed a hole in the center of Noriega's sternum, multiple holes in his chest, two fractured ribs, and fractures to his sacrum and coccyx. Ditraglia opined these injuries were consistent with gunshot wounds. Bullet fragments collected from Noriega's body were consistent with medium caliber ammunition such as a nine-millimeter, .32-caliber, or .38-caliber bullets. Although the trajectory of the bullets could not be determined, the injuries were consistent with Noriega being shot from the front. The wound to Noriega's sternum would have been potentially fatal on its own.

Defendant left town within weeks of Noriega's killing. In January 1993, law enforcement suspended the investigation into Noriega's death because they had no leads. Defendant enlisted in the Army in February 1993. He was discharged in September 1994 and returned to California. He then moved to Austin, Texas, in late 1994, where he started dating Kimberley Reeder. In May or June 1995, defendant told Reeder he had killed a man in California named "Rafa" because Rafa was a "narc." Defendant told Reeder that he put the body in the back of his truck and then hid it in or near some caves.[6] He told Reeder that when coworkers asked him about blood in the back

_____

[6] Three caves were located less than a mile from where Noriega's body was found.

of his truck, he told them it came from deer hunting. Defendant never told Reeder that he killed Rafa in self-defense.

John Sams, an acquaintance of Reeder's, testified that he overheard defendant stating that he shot someone in California for drugs and took a bag of speed from the person. Sams heard defendant say he was from California, where "we kill people for things like" "[g]etting out of line, money, drugs, things of that nature." Sams believed defendant was bragging or trying to impress people. Sams did not hear defendant assert he shot anyone in self-defense.[7]

Investigator Martin Silva interviewed defendant in Texas in January 2000.[8] Silva told defendant that he believed defendant killed Noriega. Silva confronted defendant with statements from Brown and Reeder implicating defendant. He said (apparently as a ruse) that Smith and defendant's ex-wife had implicated him as well. Silva suggested that defendant may have shot Noriega in self-defense, and that the shooting occurred after a drug transaction went poorly. Defendant admitted to engaging in methamphetamine and firearm transactions with Noriega but denied killing him. He also claimed that he was not living in Moreno Valley when the killing

---

[7]    It was introduced at trial that Sams had been convicted of two misdemeanor assaults in Texas and was previously arrested for aggravated robbery but later released without being charged. Sams's brother supplied Regina Hartwell with cocaine for drug transactions.

[8]    Defendant was advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and waived them prior to the interview.

took place. Defendant referred to Noriega as "Rafa" and said they spoke Spanish to each other.

As the interview progressed, defendant told Silva that he was getting nervous. He stated, "[W]hen I had left I thought that shit was dead," and he asked "how involved" Silva believed that defendant was. Defendant claimed he was in Texas when Noriega was killed, and that his family and former boss could verify his alibi. Silva told defendant the District Attorney's Office was seeking to extradite defendant to California. Defendant said, "See and in order for that, that means . . . you guys pretty much know that I did this." Defendant also asked whether the others involved would be charged and whether Smith "ever sa[id] he got something out of it."

Silva again suggested that defendant killed Noriega in self-defense or because defendant was high. Defendant maintained that he knew nothing about Noriega's killing, and he claimed that Brown and Smith were lying about his involvement.

### b. Evidence of other acts

#### i. Threat to kill Mike Aguon and "Christine"

In 1991, defendant was living in California with Maximillian Garcia, Mike Aguon, and a woman named Christine. One day, defendant became paranoid that Aguon and Christine were going to turn him in to the police. Defendant placed a shotgun behind the front door and told Garcia he was going to shoot Aguon and Christine when they returned. Garcia warned Aguon and Christine to stay away from the residence

until defendant calmed down. Defendant eventually did calm down, and no violence occurred.[9]

### ii. *Threat to shoot police officers*

In 1992, defendant was living with his ex-wife in Norco, California. The two argued when defendant came home drunk, and she said she was going to call the police. Defendant said, "I got something for them," and went to his bedroom to retrieve and load a shotgun. Defendant's cousin tried to wrestle the gun away from defendant, and the gun discharged into the wall. Defendant eventually left the residence when police arrived. He was not charged with any offense.

### iii. *Murder of Regina Hartwell*

Defendant moved from California to Texas in late 1994, and began dating Reeder in 1995. Through Reeder, defendant met Hartwell; Hartwell and Reeder had previously dated. Defendant and Hartwell had a contentious relationship.

In June 1995, Hartwell threatened to tell police that defendant was selling drugs. In response, defendant stabbed and killed Hartwell. He then placed Hartwell's body in the back of her car and drove it to a rural area, doused it in gasoline, and set it on fire. Additional details regarding Hartwell's murder are discussed in section II.B.1., *post*.

### 2. *Defense evidence*

Defendant recalled Investigator Silva as a witness. Silva had interviewed Reeder approximately three years after

---

[9] At trial, Garcia claimed not to recall the incident, which he had previously described to an investigator. Garcia had informed another investigator that he was reluctant to testify because he did not want to be labeled a snitch.

defendant's 1996 trial in Texas and had interviewed Brown when she was in prison in 1998. Silva testified that Reeder had said that her statement to the Texas authorities had been taped, and that defendant had told her he had hidden "Rafa" in some caves. Reeder never told Silva that defendant threatened her, hit her, or forced her to do anything.

Silva also recounted that Brown told him she was addicted to methamphetamine at the time Noriega was killed and that she was heavily intoxicated on methamphetamine at the time of the shooting. Brown also told Silva that she and defendant had used speed prior to the shooting, that defendant did not need money, that defendant and Noriega were arguing in Spanish prior to the shooting, that she was not certain what was in the green duffel bag, that defendant used a 9-millimeter Glock to shoot Noriega,[10] and that she lied to another detective about the shooting because she was on drugs.

## B. Penalty Phase Evidence

### 1. *Prosecution's case in aggravation*

The prosecution's case in aggravation included evidence presented during the guilt phase regarding the killing of Noriega, the evidence underlying defendant's conviction for Hartwell's murder, and the 1992 incident when defendant threatened to shoot police.

The prosecution also presented victim impact evidence from Armida R., Noriega's sister who was approximately 13

---

[10]     Silva clarified that Brown told him that defendant brought a Glock to Brown's apartment on the morning of the shooting, but that she never expressly said the Glock was used to shoot Noriega.

years old when Noriega was killed. She described her warm and affectionate relationship with Noriega and that he had taken care of her. She recounted the suffering she and her parents experienced when they learned of Noriega's death.

The prosecution presented additional evidence regarding several prior acts. A correctional officer testified that in September 2005 he searched defendant's cell and found a four-inch metal shank. The officer testified the shank was capable of cutting people in a "pretty brutal" way, and that he had seen people seriously injured with similar weapons. Although he was unaware of defendant stabbing anyone in prison, he knew of two incidents when defendant had been stabbed.

Another correctional officer testified that he removed defendant from his cell in December 2006, conducted a pat-down search, and felt a hard object in defendant's boxer shorts. The officer found a broken plastic toothbrush with two razor blades attached to the tip. He opined that the toothbrush was designed to be a weapon.

Dawn Bothof, defendant's ex-wife, testified concerning a number of incidents with defendant, describing their marriage as "on and off," "volatile," and "violent." They often argued about defendant's drinking and drug use. Bothof described the incident involving defendant's threat to shoot police officers. She stated that defendant had pushed her against the wall, slapped her in the face, brandished a rifle, and told her that he was going to make her "pay." When Bothof called the police, defendant pulled the phone cord from the wall.

Bothof described another incident several months later when defendant confronted a bouncer who kicked him out of a bar. Later that night when he was highly intoxicated, defendant

told Bothof that he was going to kill the bouncer and he left their home with a gun. When defendant returned home the following morning, he was still drunk and began arguing with Bothof while she was in bed. Defendant got on top of Bothof and started choking her. Bothof struggled with defendant and tried to kick him away; she felt she was blacking out and was going to die. Bothof's sister came into the bedroom and yelled at defendant to stop. Defendant released Bothof, who fled to a friend's house. When she returned, defendant was sitting on a toilet with a gun to his own head. Bothof and her sister took the gun from defendant and drove him to his uncle's house. On the way there, defendant jumped out of the car and ran, saying people were watching him.

Bothof testified that defendant left California suddenly in 1992 and went to Texas. When defendant returned about one month later, he told Bothof that he knew how to kill people and where to dump bodies so they would not be found. He said he would show her, that he had killed before, and that he could kill her. He would tell Bothof he was just trying to scare her, and he alternated between telling Bothof that a man named Kelly murdered someone and that defendant had murdered someone.

Bothof and defendant separated in late 1992 because of defendant's drug use and erratic behavior. After defendant joined the Army in 1993 his behavior improved, and Bothof moved with him to Hawaii. However, defendant eventually resumed using drugs and becoming violent again.

On one occasion in Hawaii, defendant took Bothof's keys and drove her car while he was intoxicated. Bothof was able to get defendant to stop and tried to take the keys from the car. Defendant grabbed the keys from her hand, threw her to the

ground, and drove away. Bothof's neck and back hurt for several days.

On another occasion, defendant became "hysterical" and picked up a knife after Bothof told defendant she was going to leave him. Bothof locked herself and their child inside a bathroom. Defendant stabbed the door until the door broke. Defendant forced Bothof to stay in their home for three days, making her sit on the couch while he held her at knife point. When Bothof asked to leave or got up, he pushed her down, threatened to kill her, and ordered her not to move. On the third day, defendant's father called and defendant explained what was happening. Defendant allowed Bothof to speak with his father, who told Bothof to call the police. Bothof did so. When she told defendant she had called the police, he came toward her with the knife but began stabbing his own foot, which was in a cast. Officers eventually arrived and the incident ended.

Bothof also testified that when she was pregnant with their second child, defendant kicked her in the stomach and threw her to the ground.

### 2. *Defense case in mitigation*

The defense case in mitigation included testimony from defendant, defendant's family members, and a drug and alcohol addiction specialist.

Defendant testified about his upbringing. His parents separated when he was three years old, but his extended family took good care of him. He reported that he first drank alcohol when he was three years old, and he was allowed to drink during fishing trips and family get-togethers. When defendant was seven years old, his father taught him how to smoke marijuana. This led to defendant's father showing him how to snort and

inject methamphetamine. Defendant's father would supply him with drugs. When defendant was 13 years old, his drug use included cocaine and LSD.

Defendant testified that he was not addicted to drugs and that he stopped using them for a time when he was 16 years old, although he continued to sell drugs to classmates. Defendant did well in school but he did not go to college because Bothof was pregnant. He played semi-professional football after high school and began using methamphetamine. By the time he was 20 years old, he was addicted to methamphetamine and stopped playing football.

Defendant testified that he would fight with Bothof when he was high. He admitted that he "man-handled" Bothof during arguments to get her off of him, and he admitted that he may have slapped her once or twice. He denied harming her otherwise, saying he was able to control himself even when under the influence. He acknowledged that he had retrieved a shotgun and threatened to shoot police after a fight with Bothof.

Defendant stated he met Noriega when selling drugs in Riverside; he declined to say whether Noriega was a drug dealer. Defendant denied any involvement in Noriega's death, and he clarified that he did not "physically commit" the killing. He said he had agreed to facilitate one more drug transaction for Brown before leaving Moreno Valley, although he later denied setting up any transaction between Brown and Noriega.

Defendant acknowledged that he had previously claimed he was enlisted in the Army and in Hawaii at the time Noriega was killed. He admitted that his "recollection was misplaced," that he had received a traffic citation in Texas three days after Noriega disappeared, and that he actually began serving in the

Army in February 1993. He was discharged from the Army for failure to rehabilitate and moved back to Southern California where he resumed selling drugs before eventually moving to Austin, Texas.

Defendant admitted that he was involved in Hartwell's murder but maintained that he did not kill her. He claimed other individuals were involved but that he did not know who killed Hartwell because he was not present when she died. Defendant admitted that Hartwell had threatened to turn him in to the police the night before she was killed, and that he told Hartwell to leave him and Reeder alone. Defendant also admitted that he had burned Hartwell's body in the back of her car. He denied telling Reeder, Sams, or Bothof that he had killed someone in California.

Defendant conceded that he possessed shanks in prison, but he asserted they were for protection only and that he had never stabbed anyone while in custody. He stated that other inmates paid him for protection, and that although he was involved in many fights, some of which he instigated, he was always acting in self-defense.

Defendant read a statement to the jury that he had chosen a path for himself while in custody as that of a warrior who "embraces death as part of the struggle." He stated he made his own life choices, and they had nothing to do with drugs, alcohol, or any predisposition. He asserted he was no longer addicted to drugs, and that he could have stopped his drug use at any point except when he was about 20 years old. He also told the jury that he refused his attorney's requests that defendant submit to an MRI or a mental health evaluation. Defendant did not believe he suffered from brain damage or from any learning

deficiencies, and he disagreed with a doctor who had opined that he had an addictive personality and a predisposition to use drugs. He said, "I chose the path that I lived and I'm here because of it."

Defendant further stated that his strategy during the guilt phase was to be acquitted, but that at the penalty stage he wanted to receive a death verdict, although he did not want to be put to death. He said a death verdict would be in his best interest because it "enriches and enhances certain areas of post-conviction remedies that I'm definitely seeking." He complained about the court's rulings, a lack of funds, and his attorney's refusal to follow defendant's strategy.

Defendant maintained that he was framed for the murders of Noriega and Hartwell. He said that he was reluctant to answer certain questions about his drug use because it might make the jury believe he deserved a sentence of life without the possibility of parole. He told the jury he did not want any mitigation evidence presented on his behalf, and that he had insisted on testifying during the penalty phase against his attorney's advice.

Defendant's uncle, Anchondo, also testified during the penalty phase. He said that defendant's mother drank wine when she was pregnant with defendant, although she was never "falling down" drunk. He related that defendant's mother told him she used drugs while pregnant. Anchondo stated that defendant's mother had boyfriends who were physically abusive and that defendant's mother attempted suicide four times, although Anchondo did not believe defendant was aware of those attempts. Anchondo surmised that defendant had a

difficult childhood because of his parents' drug and alcohol use and his mother's suicide attempts.

Anchondo's wife, Cynthia, also testified. She stated she never saw defendant engage in violence or drug use, and she thought he was a very happy person. She believed his relationship with his grandparents was a positive one.

Finally, Dr. Alex Stalcup, a drug and alcohol addiction specialist, testified regarding addiction and its effect on an individual's behavior and ability to make decisions. He stated that methamphetamine use can alter decision-making and permanently damage the brain, and that alcohol use as a child can also harm the brain's development. Stalcup interviewed defendant for about two hours and reviewed materials related to the case (but not any materials related to Hartwell's murder). Defendant had denied killing Noriega or being present when Noriega was killed, but he refused to discuss the incident further. Defendant told Stalcup about his drug and alcohol use as a child. Stalcup testified that defendant presented one of the worst cases for genetic predisposition to addiction that he had ever seen.

Stalcup opined that, based on defendant's methamphetamine use, defendant was a "late-stage addict" by the age of 14. Stalcup also believed defendant suffered damage to his brain that inhibited his ability to make decisions. He stated that defendant faced significant risk factors for fetal alcohol syndrome and brain damage. He testified that it was common for addicts to sell drugs to support their habit; he called this "[p]art of the disease process driven by craving" rather than a choice by the individual.

### 3. *Prosecution rebuttal evidence*

A law enforcement deputy testified regarding an incident that took place in March 2004 when he was delivering mail to defendant's cell. Defendant asked the deputy where some of his magazines were. The deputy said they were being scanned for offensive content. Defendant replied, "Don't you know who I am? I'm running things." He added, "I'm running things here, and that's no secret."

## II. GUILT PHASE ISSUES

## A. Adequacy of Court Funding

Defendant asserts the trial court effectively denied his right to self-representation by denying him adequate funding during the period of time when he represented himself. He contends that, as a result of the court's rulings, he was forced to request appointed counsel. He alleges this amounted to a violation of his Sixth and Fourteenth Amendment rights and his rights under article I, section 15 of the California Constitution. We conclude that the trial court did not err in ruling on defendant's funding requests, and thus it did not deny defendant his right to represent himself.

### 1. *Factual background*

In February 2007, defendant was represented by appointed counsel Darryl Exum and Peter Scalisi. That month, defendant filed a motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806. During the *Faretta* hearing, defendant explained that one reason he wanted to represent himself was because he did not believe appointed counsel had obtained sufficient funding to investigate his case. Defendant stated he believed he would be more successful than counsel at obtaining those funds. The trial court granted

defendant's motion and appointed Exum as stand-by counsel. As of February 28, 2007, defendant (through appointed counsel) had received approval for $57,290 in investigation funds; $1,647.95 of that remained available and the remainder had been spent.

Following the grant of his *Faretta* motion, defendant immediately filed a request for $2,500 in additional investigation funds.[11] The request stated the funds were required for investigator services such as contacting witnesses, reviewing discovery, preparing reports, and other general investigation. Defendant did not list the witnesses or explain their relevance to his case, nor did he explain the nature of the investigation required. The court approved the request but noted the funds could not be used to pay for a phone card, as defendant had also requested.

In March 2007, defendant submitted a request for $6,000 in investigation funds to locate, interview, and subpoena 50 witnesses and for other investigation. Defendant did not list the witnesses or explain their relevance to his case, nor did he explain the nature of the investigation required. The court denied the request, noting it was vague and that defendant's investigator needed to provide additional details.

Defendant filed another request in April 2007, seeking $18,000 for general investigation funds. The request did not refer to any witnesses or describe any areas of potential investigation. At a hearing on the request, the court informed defendant, "[Y]ou need to write a specific request . . . to us, to

---

[11] The Riverside County Superior Court refers funding requests made in capital cases to a panel of three judicial officers to independently review and rule on the requests.

this panel, identifying who these people are and why they're necessary to the defense of your case, whether it be guilt phase or penalty phase." The court further said that before funds would be provided for the investigator to locate witnesses, "you need to convince us that they're relevant and important enough that we're going to expend the money to have him go track them down." Defendant's investigator, Jerry Monahan, informed the court he had approximately $700 of existing funds remaining at the time of the hearing. The court approved $2,000 for investigation expenses and informed defendant it would reconsider his request if he submitted additional information.

Defendant's next request, filed in May 2007, sought $48,600, nearly $35,500 of which was related to investigation expenses for Monahan. The request listed 54 potential witnesses but did not describe their relevance beyond classifying them as civilian or military. Monahan included a memorandum with the request that provided some details regarding these witnesses. The memorandum listed 30 potential witnesses — including former teachers, coaches, coworkers, and correctional staff — who "would be used in penalty phase litigation" or "penalty phase mitigation." The memorandum also listed 14 military personnel who "were all affiliated with [defendant] in the Army at various locations and would be used in the penalty phase mitigation. Also some of these same individuals might be used in the guilt[] phase to confirm [defendant's] whereabouts during the years 1992 through 1994." The request stated, "[I]t is unknown what they might testify to."

At a hearing, the court asked whether defendant had obtained his military records "to prove where you were on a certain date." Defendant indicated he had obtained part of those records, but he needed "specific information on the witnesses

that are involved in that." The court stated, "you may want other people to add to that [the records], and I understand that." The court noted, however, that "we have to know specifically who [the investigator] is going to contact and what the relevance is, what you expect them to testify to help or assist you in the defense of your case."

At the close of the hearing, defendant stated, "Is it my understanding that we're going to come back another day and time with clarity on specific defense strategy for the witnesses." The court replied: "Right. We told you exactly what to do, and it depends on how long it takes you to do that. [¶] It depends on [the investigator] making a lot of calls and tracking down people. [¶] Get started and as you find you need more, then you can come back to us." At the time the trial court denied the motion, there were approximately $2,000 remaining in investigator funds.

In June 2007, defendant filed a request for $4,200 to cover additional investigator funds. The request noted that Monahan had attempted to contact military personnel to support defendant's alibi defense and was informed "it might not be possible to locate these soldiers." Defendant also requested funds to review and redact audiotapes provided by the prosecution. The court did not hold a hearing regarding the request. Two judges on the panel noted they did not wish to approve the request, stating, "[I]t appears [the district attorney] will redact the tapes" and "it seems that the defendant's military records can establish exactly where he was stationed in 1992–1993, [and] so you don't need any witnesses."

Defendant did not subsequently seek additional funds or provide the court any additional information regarding the

witnesses he intended to contact and what the relevance of their testimony would be. Instead, in July 2007, he moved to withdraw his self-representation and the court subsequently reappointed Exum and Scalisi as counsel. It is not apparent whether the court formally denied the June 2007 request for funds before defendant withdrew his request to represent himself, but it is clear the court did not grant the request.

### 2. *Analysis*

" '[T]he right to counsel guaranteed by both the federal and state Constitutions includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary defense services. [Citations.]' " (*People v. Blair* (2005) 36 Cal.4th 686, 732; see also *People v. Clark* (2016) 63 Cal.4th 522, 630.) "But 'the right to ancillary services arises only when a defendant demonstrates such funds are "reasonably necessary" for his or her defense by reference to the general lines of inquiry that he or she wishes to pursue.' " (*People v. Clark*, *supra*, 63 Cal.4th at p. 630.) "[T]he crucial question . . . is whether [defendant] had reasonable access to the ancillary services that were reasonably necessary for his defense." (*People v. Blair, supra*, 36 Cal.4th at p. 734.)

Requests for funds for an indigent defendant in a capital case are governed by section 987.9. " ' "Section 987.9 commits to the sound discretion of the trial court the determination of the reasonableness of an application for funds for ancillary services." . . . .' " (*People v. Clark, supra*, 63 Cal.4th at pp. 630–631.) A court "should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085.) Further,

21

defendant "has the burden of demonstrating the need for the requested services." (*Ibid*.; see also *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1256; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 286; § 987.9.) Defendant also must establish a likelihood that the evidence sought to be procured by the funds would be admissible, as " 'there is no point in spending money to obtain inadmissible evidence.' " (*People v. Clark*, *supra*, 63 Cal.4th at p. 631.) " 'An appellate court reviews a trial court's ruling on an application for authorization to incur expenses to prepare or present a defense for abuse of discretion.' " (*Ibid*.)

We conclude the trial court did not abuse its discretion when it determined defendant had not established a reasonable necessity for the requested funds. Defendant broadly asserts that the trial court's funding decisions hampered his ability to: "(1) secure exhibits; (2) obtain the attendance of witnesses at trial; (3) dress properly during the trial; (4) obtain assistance during the trial itself; (5) transcribe witness testimony during the trial; and (6) assist with diagrams and exhibits during the trial." Beyond these general assertions, defendant focuses on the denial of funds related to two issues: his alibi defense (that he was serving in the Army in Hawaii at the time of Noriega's murder); and his preparation of mitigation evidence for the penalty phase (through contacting former teachers and coaches). He further contends that the denial of funds for his investigator "was exacerbated by the trial court's refusal to fund phone card privileges so [he] could communicate with his investigator."

These contentions are unavailing. Despite several directives from the court that defendant's requests must include specific information regarding the purpose of contacting the

listed witnesses and conducting the requested investigation, defendant's requests were vague and only generally identified how the expenditures might contribute to the preparation of his defense. For example, in listing more than 50 witnesses and requesting nearly $35,000 for investigation, travel, and trial preparation related to those witnesses, defendant conceded "it is unknown what they might testify to." Although defendant identified several military personnel as potential witnesses, he never identified which of those witnesses would serve as alibi witnesses. Defendant's June 2007 request for funds related to his alibi defense asserted additional funds would be needed "if a response is received" from the Army providing additional information regarding those individuals.[12] And, as defendant conceded when he testified during the penalty phase, any such additional investigation would have been fruitless because he did not enter the Army until several months after Noriega's killing. Further, although defendant listed a number of witnesses he stated would be used during the penalty phase, he failed to describe their anticipated testimony in any detail.

These general assertions are not sufficient to meet the statutory requirement for a showing of reasonable necessity before funds are disbursed. The sparse nature of defendant's descriptions provided no basis for the court to determine whether the potential testimony would be irrelevant,

---

[12] Defendant emphasizes that the court denied his request because it believed his military records obviated the need for any witnesses. It is true one judge on the panel reviewing defendant's funding requests made that observation. But the court also observed that it would be appropriate for defendant to obtain witnesses to corroborate those records — and it simply asked for more information regarding those alleged witnesses.

cumulative, or otherwise inadmissible. (See *People v. Clark*, *supra*, 63 Cal.4th at p. 631.) And, as the court noted, there was potential for duplicating earlier investigative efforts given that defendant indicated he wanted the investigator to "reinterview" certain witnesses. (See *People v. Hajek and Vo, supra*, 58 Cal.4th at p. 1256 [upholding denial of funds for counsel's request to " 'reinterview every witness' " for the penalty phase when counsel's stated reason was simply that " 'it's a death penalty case' "]; *People v. Guerra, supra*, 37 Cal.4th at pp. 1085–1086.) The trial court did not abuse its discretion by requiring a more detailed showing from defendant before providing funds.

Because the court did not err, we also reject defendant's claim that the court's "refusal to fund phone card privileges" exacerbated the alleged error. Notably, the court ordered the sheriff to allow defendant to call his investigator, and defendant has provided no evidence that his ability to direct his case was otherwise hampered.

Finally, as defendant acknowledges, the court did not withhold all requested funds. Before the court granted defendant's *Faretta* motion, the court had approved more than $57,000 in funds for investigative purposes. During the time defendant represented himself, he had access to $6,147.95 for investigation: $1,647.95 that remained available when he began representing himself, and $4,500 the court approved when defendant was representing himself. Additionally, the court granted defendant's funding request for legal materials and advisory counsel to investigate the validity of his Texas conviction. Given the totality of the circumstances, the court's actions did not constitute an abuse of discretion, did not effectively force defendant to withdraw his self-represented

status, and did not violate defendant's state or federal constitutional rights.

## B. Claims Regarding Admission of Evidence

### 1. *Hartwell's murder*

Defendant asserts the trial court erred by admitting evidence of Hartwell's murder. He asserts doing so ran afoul of Evidence Code sections 350, 352, and 1101. Although we find the question somewhat close, we conclude that the trial court did not abuse its discretion in admitting this evidence.

### a. *Factual background*

As discussed in section I.A.1.b.iii, *ante*, the prosecution introduced evidence of defendant's murder of Hartwell. Additional facts regarding Hartwell's murder are relevant to defendant's claim of error.

In May 1995, defendant met Reeder and they soon began dating and using drugs together. When dating defendant, Reeder continued to socialize with Hartwell, with whom Reeder had a prior romantic relationship. Defendant was selling drugs at the time, and Hartwell convinced defendant that he could sell drugs through her at clubs. Reeder believed that Hartwell and defendant did not like each other; she testified that the two occasionally argued, that Hartwell was jealous of defendant, and that the relationship between Hartwell and defendant was "[o]dd" and "different."

On June 28, 1995, Hartwell and Reeder argued at Hartwell's apartment over Reeder's plan to move in with her parents. Reeder eventually left, and Hartwell talked with her friend, Jeremy Barnes, at his apartment. Hartwell told Barnes that she still loved Reeder and asked Barnes whether she should

report defendant to the police so that defendant would be out of their lives.

Later that evening, Hartwell called Reeder. Defendant was sitting near Reeder during the call. Hartwell asked Reeder to come back to Hartwell's apartment. Reeder refused, which made Hartwell angry. Hartwell asked to speak with defendant, and Reeder gave him the phone. Defendant listened to Hartwell for a few minutes; Reeder could hear that Hartwell's voice sounded upset.

Defendant "seemed very seriously upset" after the call. Defendant said Hartwell had threatened to turn him in to the police for selling drugs and told him that she had a contact with the police. He told Reeder that he "wasn't going to let anybody send him to prison." Reeder believed defendant was planning to kill Hartwell.

Reeder drove defendant to a restaurant to meet a few friends. Over dinner, defendant told his friends, including Michael Mihills, that Hartwell was going to turn him in to the police for selling drugs. Reeder picked defendant up at the restaurant after about an hour, and the two returned to Reeder's apartment. Reeder took Valium and fell asleep. She stated she did not know what defendant did or whether he got into bed with her.[13]

Meanwhile, Hartwell called her friend Sylvia Leal. Leal testified that Hartwell sounded furious and frightened. Hartwell told Leal that defendant had been involved in a

---

[13]    Reeder had previously testified that she and defendant both awoke the next morning, she saw defendant getting dressed, and she fell back asleep.

murder and that he dealt firearms. Hartwell wanted to "bust" defendant, explained that defendant would be receiving a methamphetamine shipment, and she asked Leal to contact a narcotics investigator. Leal told Hartwell she would get a phone number for Hartwell.

The next morning, Reeder was awakened by defendant knocking on her door. He "seemed upset, disturbed, anxious" and was bleeding from a serious cut between the thumb and index finger of his hand. Defendant undressed, put his clothes in a garbage bag, and took a shower. Reeder noticed that Hartwell's wallet was in the apartment. Defendant told Reeder that he was cut during a struggle with Hartwell, who he said was much stronger than he had anticipated. Defendant said the fight occurred when he walked into Hartwell's apartment. He told Reeder that he stabbed Hartwell when she was on her couch, that he dragged Hartwell to the bathtub, and that he wrapped her in a bed comforter. He then carried her downstairs to the back of her jeep, which he drove to Reeder's apartment.

Defendant discussed cutting Hartwell's body into pieces and buying cement, chains, and garbage cans to sink the body parts into a river. Reeder and defendant drove to a hardware store, where they purchased a garbage can, cement, a chain, and a padlock using Hartwell's ATM card. Defendant then drove to his house in Hartwell's jeep; Reeder followed in her own car. Eventually, defendant told Reeder he could not cut up Hartwell's body because there were people who might see him.

Defendant's father came home and told defendant to take Hartwell's jeep off the property. Defendant drove the jeep to a rural area and parked it off the road in a wooded location; Reeder again followed in her car. Reeder and defendant drove

to a gas station in Reeder's car, filled a container with gasoline, and returned to Hartwell's jeep. Reeder parked her car some distance away from the jeep and waited while defendant poured gasoline on the jeep and lit it on fire. Defendant ran back to Reeder's car, and the two drove to a hotel in Austin, where Reeder checked in using a former name. There, defendant dyed and cut his hair. He told Reeder that he was going back to California.

About 9:45 p.m., fire officials responded to the vehicle fire, which they described as "[v]ery hot and very intense." The jeep was completely burned and the area smelled strongly of gasoline. Hartwell's remains were found in the back seat, burned beyond recognition. She was identified using dental records. A folding knife wrapped in a blue cloth was discovered near the body.

Dr. Robert Bayardo, the medical examiner who performed the autopsy on Hartwell's body, described the body as "partially cremated" with large portions burned to ash. Bayardo located a stab wound above Hartwell's collarbone, which perforated her lung, extended into her back, and severed a large vein and artery. He opined the wound would have been fatal, that the knife found near Hartwell's body was capable of inflicting such a wound, and that there was an 80 percent chance that Hartwell was in a seated position when she was stabbed. Because there was no soot or smoke in Hartwell's airways or carbon monoxide in her blood, Bayardo concluded Hartwell was already dead prior to being burned. He noted that he would not expect the stab wound to cause extensive external bleeding.

Several days after the killing, Barnes and Leal filed a missing person report regarding Hartwell. Reeder and

defendant were contacted by police and taken to the police station. An officer observed the cut on defendant's hand, which was healing but still looked "[f]airly serious." Officers took photographs of the wound. Defendant was subsequently arrested.

Reeder gave a sworn statement to police. At the time she gave the statement she had used drugs about 12 hours earlier and was either high or experiencing withdrawals. She implicated herself in Hartwell's killing but withheld some details to protect defendant. Reeder was later charged with Hartwell's murder but the charges were dropped due to a violation of her rights under *Miranda v. Arizona, supra*, 384 U.S. 436. Reeder later agreed to testify at defendant's trial for Hartwell's murder under a grant of immunity.

Law enforcement searched defendant's home and Hartwell's apartment. At defendant's home, officers found the receipt from the hardware store, the hotel receipt, Hartwell's ATM card, a chain, and a trash can. DNA from blood samples taken at Hartwell's apartment matched Hartwell and defendant. Defendant was eventually convicted of Hartwell's murder.

### b. Analysis

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) "Relevant evidence is broadly defined as that having a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405 (*Bryant*), quoting Evid. Code, § 210.) Evidence Code section 1101 states that although evidence of a person's character is inadmissible when offered to prove conduct on a specific occasion, "evidence that a

person committed a crime, civil wrong, or other act [is admissible] when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) In other words, the statute allows the admission of evidence of criminal activity other than the charged offense " 'when such evidence is relevant to establish some fact other than the person's character or disposition.' " (*People v. Johnson* (2022) 12 Cal.5th 544, 610.)

"When reviewing the admission of other crimes evidence to show motive, ' "a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant." ' " (*People v. Johnson*, *supra*, 12 Cal.5th at p. 610.) We review a trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Johnson*, *supra*, 12 Cal.5th at p. 610; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.) We do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a " 'patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Powell* (2018) 6 Cal.5th 136, 162.)[14]

---

[14] Defendant asserts de novo review is appropriate because "this Court can review the prosecutor's offer of proof regarding Hartwell's death, and assess its relevance as well as the trial court," citing *In re Jenkins* (2010) 50 Cal.4th 1167. *Jenkins* concerned the validity of a regulation from California's Department of Corrections and Rehabilitation governing work

Addressing the merits of defendant's claim, we must consider two issues. First, defendant asserts the trial court admitted the challenged evidence only to demonstrate intent, and therefore that our review should be limited to whether the other acts evidence was properly admitted on that basis. Second, defendant asserts that, regardless of the purpose for which the trial court admitted the evidence, doing so was error under Evidence Code sections 1101 and 352.

As discussed below, our analysis here relates to defendant's blanket challenge to the admission of any evidence related to Hartwell's murder. Because defendant did not raise objections to specific pieces of evidence (with certain narrow exceptions also discussed below) neither the trial court nor this court is in a position to parse the record independently and examine each piece of evidence under Evidence Code section 352. Undertaking an analysis of defendant's blanket challenge, we hold that the trial court did not abuse its discretion under either Evidence Code sections 1101 or 352 by admitting the evidence related to Hartwell's murder.

### i. *Purpose of admission*

The prosecution filed a pretrial motion seeking to admit evidence of Hartwell's murder "to demonstrate intent,

_____

credits and is inapposite. (*Id.* at pp. 1171–1172.) We stated that "we have 'allowed parties to " 'advance new theories on appeal when the issue posed is purely a question of law based on undisputed facts, and involves important questions of public policy.' " ' " (*Id.* at p. 1180.) Defendant provides no compelling reason why *Jenkins*, which is entirely unrelated to the admission of evidence under Evidence Code sections 352 and 1101, should override our consistent application of the abuse of discretion standard to the evidentiary issues raised here.

premeditation and deliberation, motive, common plan or scheme, and lack of self-defense." In that motion, the prosecution asserted the evidence was admissible because, among other reasons, it supported the conclusion that defendant had killed Noriega and Hartwell for the same motive — to avoid going to prison because defendant thought Noriega was "a snitch" and because Hartwell had threatened to report defendant to police. Judge Luebs granted the motion when defendant was representing himself. Judge Boren revisited the motion when defendant was represented by counsel. At the later hearing, defense counsel objected to the admission of evidence regarding Hartwell's murder. The court granted the prosecution's motion over defendant's objection, finding "a sufficient basis under 1101(b) for that to come in. It . . . seems to me it has relevance to, and is probative on, the issue of the defendant's state of mind, his intent, and that . . . under 352 the negative factors simply do not outweigh that probative value. So I would allow the 1101(b) evidence in."

Defendant asserts that the trial court's ruling admitted the evidence solely to prove intent, and that this court cannot consider other reasons for admitting the evidence under Evidence Code section 1101, subdivision (b). He contends that "[t]he prosecutor's failure to cite the theories of admissibility now offered by [the People] deprived [defendant] of the opportunity to argue to the trial court why the evidence was either not admissible under those theories or should be excluded under section 352." This position is unavailing.

As described above, the prosecution expressly relied on motive as one basis for admissibility in the trial court. Although the trial court stated it found the evidence relevant to defendant's "state of mind" and "his intent," the record does not

support defendant's assertion that the trial court admitted the evidence solely to show intent without any reference to motive. Rather, the court's discussion of the issue with counsel, including its discussion of the jury instructions relevant to this evidence, indicates the court understood its ruling to be more broad than defendant contends. When Judge Boren considered the prosecution's motion to admit the evidence, defense counsel requested clarification concerning the purpose for which the evidence would be offered. The court asked the prosecution if it wished to clarify, stating, "I think you did lay it out previously." The prosecution agreed that it had done so, and further stated, "What I'd be happy to do is confer with counsel and let them know precisely what I intend to use it for and answer any questions they may have about what theories I intend to offer." Defense counsel agreed to that approach.

Later, after Reeder testified, the jury was instructed that it could consider evidence of Hartwell's murder for the limited purpose of deciding, as relevant here, whether defendant intended to kill Noriega, had a motive to kill Noriega, or killed Noriega in self-defense or as the result of an accident. Although defendant objected generally at that point to the admission of the testimony under Evidence Code section 1101, subdivision (b), he did not assert the instruction should be narrowed to refer only to intent but agreed with the instruction as written. The court stated it would admit the evidence "for the reasons as previously stated." The court also read the instruction to the jury at the close of trial. The instruction informed the jury that it could not consider evidence of uncharged conduct unless it found by a preponderance of the evidence that defendant had committed that conduct. It further instructed, "If you decide that the defendant committed the uncharged act or acts, you

may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant acted with the intent to kill Rafael Noriega in this case, or the defendant acted with the intent to permanently deprive Rafael Noriega of property of some value in this case, or the defendant had a motive to commit the offense alleged in this case, or the defendant's alleged actions were not the result of accident in this case, or the defendant had a plan or scheme to commit the offense alleged in this case, or the defendant's alleged actions were not the result of self-defense in this case, or the defendant acted with premeditation and deliberation in this case."

When discussing jury instructions, defendant did not object to the instruction on the basis he now raises; that is, he did not assert that the instruction should be limited to refer only to intent. Thus, the combination of the colloquy between the court and counsel regarding this evidence and the jury instructions provided make clear that the court did not admit the evidence of Hartwell's murder solely to establish intent. Rather, the jury was clearly told it could consider the other acts evidence on the issue of motive.

Further, the prosecution relied on evidence of defendant's motive for killing Hartwell in order to establish defendant's motive and intent to kill Noriega. In this way, the evidence of motive was offered to prove the ultimate fact of defendant's intent. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 14 ["Motive, though not itself an ultimate fact put at issue by the charges or the defense in this case, was probative of two ultimate facts, intent and lack of justification"].) We therefore decline to limit our consideration of the admission of the

evidence under Evidence Code section 1101, subdivision (b) to the issue of intent, as defendant asserts we must.[15]

### ii. Abuse of discretion

As stated, we review a trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Johnson, supra,* 12 Cal.5th at p. 610.) We find there was no abuse of discretion. The prosecution's theory of the case was, in relevant part, that defendant killed Noriega because defendant believed Noriega was a "narc" — i.e., that defendant believed Noriega was going to report him to the police. The prosecution sought to introduce evidence that defendant killed Hartwell because Hartwell threatened to have

---

[15] The current instruction regarding uncharged offenses directs the trial court to "select specific grounds of relevance and delete all other options." (CALCRIM No. 375.) The parties here primarily focus on the role of intent and motive, but they do not discuss the portion of the jury instruction referring to common plan. Although the Attorney General does not assert the other acts evidence was admissible to establish a common plan, defendant does not challenge this portion of the instruction (and in fact agreed at trial to the instruction as provided) and thus has forfeited any such claim. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Even if we were to consider the issue, we would find any error harmless because, as we have concluded, there existed an independent basis to admit the evidence under Evidence Code section 1101, subdivision (b), and there is no indication the jury relied on a common plan theory in reaching the verdict here. It is thus not reasonably probable that the outcome would have been different absent any error. (*People v. Beltran* (2013) 56 Cal.4th 935, 955 [applying test for harmless error articulated in *People v. Watson* (1956) 46 Cal.2d 818 — that the error is harmless unless it is reasonably probable the outcome would have been different in the absence of the error — to incorrect jury instructions that do not amount to federal constitutional error].)

defendant arrested for selling drugs. This is a sufficient basis to support the admission of the evidence under Evidence Code section 1101, subdivision (b).

*People v. Demetrulias*, *supra*, 39 Cal.4th 1 is instructive. There, we stated that "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*Id.* at p. 15; see also *People v. Daniels* (1991) 52 Cal.3d 815, 857, *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 374.) Thus, in *Demetrulias* we upheld the admission of evidence of the defendant's motives for robbing and assaulting one individual in order to support the prosecution's theory that the defendant had the same motive when he stabbed and killed the victim in the charged offense. (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 15.) Similarly, we have held that evidence that a defendant had previously "stalked, bound, and assaulted" women and admitted that he "found his attacks sexually stimulating" was "relevant and admissible to prove his motive to sexually assault" a later victim. (*People v. Davis* (2009) 46 Cal.4th 539, 604–605; see also *People v. Spector* (2011) 194 Cal.App.4th 1335, 1381 [one theory that supports admission is when " 'the uncharged act evidences the existence of a motive, but the act does not supply the motive . . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive'* "], quoting 1 Imwinkelried, Uncharged Misconduct Evidence (2009) § 3:18, pp. 128–129.)

Here, too, the prosecution offered evidence of Hartwell's murder based on the theory that her murder and the killing of Noriega were explainable as a result of the same motive: defendant killed Hartwell because she threatened to report him

to police, and defendant killed Noriega because he believed Noriega was a "narc." This conclusion was further supported by additional evidence of other crimes presented at trial. The prosecution introduced evidence that defendant planned to kill Aguon and Christine because he believed they were going to report him to police for dealing drugs. And the prosecution introduced evidence that defendant armed himself with a shotgun when he believed police had been called following an incident of domestic violence. Each of these incidents involved defendant reacting to a belief that he had been or would be reported to police, and his committing or preparing to commit violence in order to avoid arrest. As the prosecution argued in its motion in limine, defendant "repeatedly planned to kill people to avoid arrest, over a period of a few years, and under the similar circumstances that the defendant believed his targeted victims were going to turn him in to police for his criminal behavior." The trial court did not abuse its discretion in admitting the evidence under Evidence Code section 1101, subdivision (b) based on this theory.

We next turn to whether the trial court abused its discretion when concluding that the probative value of evidence related to Hartwell's murder was not outweighed by any potential for prejudice under Evidence Code section 352. Although this presents a closer question, we conclude the trial court did not abuse its discretion.

Prejudice under Evidence Code section 352 refers to " ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 270.) In this context, " ' " 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Virgil* (2011) 51 Cal.4th 1210,

1249.) " 'Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a section 352 objection should fail.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439.)

Defendant raises several arguments in support of his claim that the evidence regarding Hartwell's killing was unduly prejudicial. First, he asserts the evidence "simply portrayed [defendant] as an evil and out of control person" because "[t]here was no relationship between the incidents." Not so. As explained above, Hartwell's murder demonstrated defendant's motive to kill in order to avoid being arrested or "snitched" on. It was directly connected to the prosecution's theory of the case. Further, any potential for undue prejudice was mitigated by the instruction provided to the jury that specifically prohibited the jury from concluding based on the other acts evidence that "the defendant has a bad character or is disposed to commit crime." Additionally, the jury was informed that defendant had been convicted of Hartwell's murder. As the trial court here observed, this reduced the potential for undue prejudice because it ensured that "the jury was not tempted to convict defendant of the charged offenses, regardless of his guilt, in order to assure that he would be punished for" Hartwell's murder. (*People v. Balcom* (1994) 7 Cal.4th 414, 427.)

Second, defendant contends the main issue with regard to the killing of Noriega was the identity of the perpetrator, not the perpetrator's motive or intent. Thus, he claims, the Hartwell

evidence was irrelevant. Again, Hartwell's murder was relevant to establish motive under Evidence Code section 1101, subdivision (b). Defendant pleaded not guilty, placing all elements of the offense at issue. Defendant cannot now claim that, because he did not contest intent or premeditation, the prosecution was barred from introducing this evidence. (*People v. Bryant*, *supra*, 60 Cal.4th at p. 407; see also *People v. Scott* (2011) 52 Cal.4th 452, 470–471.)

Third, defendant asserts the evidence of Hartwell's murder "required lengthy and prejudicial testimony." The Attorney General concedes that the testimony regarding Hartwell's murder "consumed a considerable amount of time." Indeed, the record demonstrates that a substantial portion of the prosecution's opening argument and about half of the trial testimony related to Hartwell's murder. And the details of Hartwell's murder included disturbing photographs and testimony regarding her stabbing and the gruesome condition of her body.[16] The extent of evidence presented regarding the uncharged offense, coupled with the graphic nature of some of the evidence, is what makes this a close case. We nonetheless conclude that defendant has not established error under the highly deferential standard applicable here. (See *People v. Miles* (2020) 9 Cal.5th 513, 587 [trial court's decision to admit evidence under Evidence Code section 352 will not be disturbed unless the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice].)

---

[16] We discuss defendant's specific objection to the photographs and testimony related to Hartwell's body in section II.B.3, *post*.

The prosecution was required to prove by a preponderance of the evidence that defendant murdered Hartwell in order for that act to be considered under Evidence Code section 1101, subdivision (b). (*People v. Foster* (2010) 50 Cal.4th 1301, 1346.) The prosecution's testimony thus focused on defendant's behavior in Texas, including his statements made to other individuals relevant to Noriega's murder (i.e., statements to Reeder that he had killed a "narc," and statements overheard by Sams that he killed someone in California for drugs), defendant's relationship with Hartwell that led to their falling out, and defendant's decision to kill Hartwell after she told defendant she would report him to police.

The prosecution's main witness implicating defendant in Hartwell's killing was Reeder. Reeder provided evidence that defendant killed Noriega because he was a "narc," and she provided additional testimony regarding defendant's statements about killing Noriega (that he put Noriega's body in the back of a truck and hid the body in or near some caves). She described defendant's plan to kill Hartwell because Hartwell had threatened to turn defendant in to the police, defendant's statements to Reeder about killing Hartwell, and their disposal of Hartwell's body. Reeder's testimony thus not only supported the prosecution's state of mind argument but also was central to its assertion that defendant killed Noriega.

Defendant vigorously cross-examined Reeder and attacked her credibility. During closing arguments, defense counsel pointed to alleged inconsistencies in Reeder's testimony and emphasized to the jury that Reeder had been given immunity for her testimony. Counsel stated that Reeder "told you she would be admitting to the murder, the murder of Regina Hartwell without immunity. And why did she walk? Why did

she skate? Some technical loophole, some technicality and she walks. . . . Meanwhile she's buying the gasoline to burn the body." At one point, defense counsel asserted Reeder's testimony that defendant had killed Noriega because he was a "narc" was not supported by any other evidence. At another point, counsel questioned whether it was Reeder who killed Hartwell, saying, "Do I know if she killed Regina Hartwell? I don't know. She certainly had motive. She had way more motive than Justin Thomas."[17]

The prosecution bolstered Reeder's credibility by providing testimony from other witnesses. Leal, Barnes, and Mihills all corroborated Reeder's statement that Hartwell planned to report defendant to the police. Law enforcement officials described the chain of custody regarding relevant evidence (including a knife consistent with the wound to Hartwell's body) and corroborated other details from Reeder's story including, for example, the cut to defendant's hand and that he had purchased a chain and a trash can when planning to dispose of Hartwell's body. The medical examiner described the knife wound found during Hartwell's autopsy as being consistent with Reeder's reported account that defendant had stabbed Hartwell when she was in a seated position. The prosecution emphasized to the jury that these other witnesses corroborated Reeder's testimony: "The real issue in the case is the credibility of the People's witnesses, right; Dorothy Brown,

---

[17] When considering an objection to testimony from the medical examiner during trial, the court observed that, "there has been some cross-examination of some evidence that suggests perhaps that someone other than Mr. Thomas did it [killed Hartwell], or that Ms. Reeder had a greater role in it, perhaps, than she announced."

Kim [Reeder], Michael Mihills, John Sams, right. . . . [¶] Rather than just saying, you know what, I choose to believe Kim [Reeder], which you can do, you don't have to, though. Because you can look at all the other witnesses and all the other evidence, and you'll see that it corroborates them."

Understood in this context, we cannot say that it was an abuse of discretion for the trial court to admit the extensive evidence regarding Hartwell's murder, that the amount of time necessary to present it was excessive, or that the nature of the evidence was unduly prejudicial. Although another trial court might have reasonably reached a different conclusion, that is insufficient to demonstrate an abuse of discretion. (See *Mercer v. Perez* (1968) 68 Cal.2d 104, 114 [abuse of discretion cannot be found simply because a different decision "could have been reached"].)

Next, defendant contends the strength of the evidence implicating him in Hartwell's murder improperly bolstered the comparatively weak evidence connecting him to Noriega's murder. We cannot agree with defendant's characterization of the evidence implicating him in Noriega's killing as "weak." The jury heard testimony from Brown, who was an eyewitness to the killing. Reeder's testimony corroborated Brown's by providing details defendant conveyed to Reeder regarding his shooting of "Rafa," and that defendant put the body in the back of his truck and then hid it in or near some caves. Sams also testified that defendant admitted to killing someone in California. Although defendant attacks the credibility of these witnesses and the reliability of the evidence generally, it was for the jury to determine whether they found the testimony credible and reliable. Given this evidence, it was not an abuse of discretion for the trial court to determine that the probative value of the

evidence related to Hartwell's murder would outweigh the potential for undue prejudice. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 406.)

Finally, defendant asserts that other evidence used by the prosecution to connect him with Noriega's death was unreliable. He focuses on testimony from Barajas and her sister, Brown's testimony from the Texas trial, and defendant's statements to third parties that he had killed someone in California. Other than the objections to Brown's testimony discussed in section II.B.4, *post*, defendant does not challenge the admission of this other testimony. It was for the jury to evaluate the evidence and to reach a conclusion regarding defendant's guilt. To the extent defendant asserts the admission of evidence related to Hartwell's murder was prejudicial given this other allegedly unreliable evidence, that assertion is not compelling in light of our above evaluation of the claim under Evidence Code section 352.

We find it significant that defendant's challenges under Evidence Code sections 1101, subdivision (b) and 352 are to the admission of *any* evidence related to Hartwell's murder; both in the trial court and in this court, he did not raise any specific objection to particular testimony or pieces of evidence (aside from certain photographs and related testimony discussed in section II.B.3, *post*). Thus, the trial court generally ruled that evidence related to Hartwell's murder was admissible. It did not, however, parse the proffered testimony to determine the potential for undue prejudice nor did it consider how particular testimony might be tailored to avoid alleged undue prejudice.

Although a more nuanced analysis of the proffered evidence might have been beneficial, it was not incumbent on

the trial court to undertake such an endeavor absent a specific objection and request from counsel. Evidence Code section 353, subdivision (a) requires counsel to "make clear the specific ground of the objection or motion." Specific objections serve the important purpose of "fairly inform[ing] the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435). "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*)

We have previously held the type of general objection defendant made here is not sufficient to preserve a claim as to specific pieces of evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 477.) In *Cowan*, the defendant objected before trial to the introduction of any postmortem photographs of the victim. (*Id.* at p. 476.) The court overruled the objection, but "left open the possibility that, upon proper objection, it might later conclude that any particular photograph was irrelevant." (*Id.* at p. 477.) The defendant did not later renew his objection as to specific photographs and we held that this failure to object "forfeited any claim that the trial court erred by failing to weigh each photograph's individual probative value against its individual prejudicial effect." (*Ibid.*) For the same reason, we decline to attempt to parse the evidence here given defendant's lack of a specific objection in the trial court or in this court to any particular evidence related to Hartwell's murder.

At oral argument in this court, defense counsel asserted that objections to specific portions of the evidence at trial once the trial court had made its initial ruling to admit evidence of

Hartwell's murder were not required and would have served only to annoy the trial court. To the extent this might be understood as an assertion that specific objections would have been futile, such an assertion is inconsistent with the record. When ruling on the prosecution's motion to admit the evidence, the court stated, "I think that that very probative value *as I understand it from the offer of proof and the information available* is not substantially outweighed by any undue prejudicial effect or any other negative aspect of [Evidence Code section 352]." (Italics added.) As in *Cowan, supra,* 50 Cal.4th at page 477, this indicated that the court's ruling was based on a preview of the evidentiary representations made by counsel at the time it ruled on the pretrial motion and that the court was not foreclosing further rulings as the evidence developed. Indeed, the trial court did consider and rule on later objections to specific evidence, including evidence related to Hartwell's murder. For example, after the trial court generally admitted evidence of Hartwell's murder it considered the prosecution's motion to admit photographs of Hartwell's autopsy and defendant's related objections. The trial court conducted an evaluation of the evidence in light of that specific objection and admitted, excluded, or deferred ruling on photographs of Hartwell's autopsy. When defense counsel raised the objection to the autopsy photographs and the pathologist's testimony again during trial, the trial court conducted another analysis of the relevance and potential for prejudice before admitting the evidence. This is precisely the process the Evidence Code calls for in order to fairly present and preserve a challenge to proffered evidence.

Considering, then, defendant's objection to the admission of any evidence related to Hartwell's murder, we conclude that

the trial court did not abuse its discretion under Evidence Code sections 1101, subdivision (b) or 352. Because there was no statutory error, defendant's constitutional claims likewise fail. (See *People v. Fuiava, supra*, 53 Cal.4th at p. 670; *People v. Foster* (2010) 50 Cal.4th 1301, 1335.)

### 2. *Defendant's alleged plan to kill Aguon and Christine*

Defendant asserts the admission of evidence regarding his alleged plan to kill Aguon and Christine also violated Evidence Code sections 1101, subdivision (b), and 352. The Attorney General contends the claim is forfeited and without merit. Even if we were to find the claim was not forfeited, we agree with the Attorney General that the trial court did not err in admitting this evidence.

### a. *Forfeiture*

The Attorney General contends defendant forfeited any claim related to the admission of evidence of a plan to kill Aguon and Christine by failing to object at trial. The prosecution moved before trial to admit the evidence under Evidence Code section 1101. The trial court considered the prosecution's motion on two occasions. First, Judge Luebs granted the prosecution's motion to admit the evidence at a hearing in April 2007 when defendant was representing himself. In October 2007, when defendant was represented by counsel, Judge Boren allowed defendant to reargue motions that Judge Luebs had previously ruled on, including the admission of other acts evidence under Evidence Code section 1101, subdivision (b).

Defendant acknowledges that although defense counsel objected at the October 2007 hearing to the introduction of evidence regarding Hartwell's murder, counsel did not raise any

objection regarding the plan to kill Aguon and Christine. Defendant maintains, however, that he preserved the issue when he was representing himself at the April 2007 hearing by stating: "I believe that would be prejudicial because there is no police reports [sic] indicating threats were made in that manner." The transcript of the hearing, however, reveals that defendant did not raise a proper objection to preserve his claim.

During the April 2007 hearing, the court initially raised the prosecution's motion to admit evidence under Evidence Code section 1101, subdivision (b) and asked defendant if he objected to the motion. Defendant stated, "At this time no, your Honor." The prosecution and the court then discussed several incidents that the prosecution sought to introduce at trial: the murder of Hartwell; defendant's threat to kill police officers; and defendant's plan to kill Aguon and Christine. Regarding the threat to police, the prosecution stated that defendant told Investigator Silva that "he got the gun because he thought the police were coming and he was ready to use it with the police." Regarding the threat to Aguon and Christine, the prosecution stated it would rely on testimony from Maximilian Garcia. After further discussion, the court inquired again of defendant whether he had any objections. The following exchange then occurred:

"[Defendant]: Your Honor, I wasn't aware. I haven't had a chance to review the tapes of the Silva interview. I was not aware.

"[Court]: It was in the moving papers, essentially the description of it. But do you want to — you heard what he said, right?

"[Defendant]: Yes, sir.

"[Prosecution]: It is also in the transcripts that were turned over.

"[Court]: Okay.

"[Defendant]: I believe that would be prejudicial because there is no police reports [sic] indicating threats were made in that manner.

"[Court]: This case — you apparently said it yourself. You told Mr. Silva. He has it on tape, apparently.

"[Defendant]: I haven't agreed to that evidence.

"[Court]: So your only objection is you haven't reviewed the evidence. [¶] Assuming it is there, sir, is there some reason I should not grant the motion under 1101 of the Evidence Code? You have to give me legal basis, because [the prosecution] made a compelling argument.

"[Defendant]: I cannot, your Honor."

This exchange makes clear that defendant's objection was related to his statements to Silva regarding the alleged threat to police officers, and in any event was not made under Evidence Code section 1101. Defendant's objection thus was not sufficient to preserve a challenge under Evidence Code sections 1101 and 352 to the evidence of a plan to kill Aguon and Christine. (*People v. Valdez* (2012) 55 Cal.4th 82, 130 [objection must fairly inform the court and the party offering the evidence of the specific reasons the evidence should be excluded so the party offering the evidence can respond and the court can make an informed ruling]; Evid. Code, § 353 [verdict may not be set aside based on erroneous admission of evidence absent a timely and specific objection on the record, or the error resulted in a miscarriage of justice].)

### b. *Analysis*

Even assuming defendant preserved his claim regarding the admission of evidence related to his threat to kill Aguon and Christine, we conclude there was no error in admitting that evidence.

As stated above, we review the trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Johnson*, *supra*, 12 Cal.5th at p. 610.) We find no abuse of discretion.

The evidence regarding the threat to kill Aguon and Christine was admissible to establish motive under Evidence Code section 1101, section (b). Like the evidence regarding Hartwell's murder, the threat to Aguon and Christine bolstered the prosecution's theory of the case by providing an additional example of a situation when defendant planned lethal violence when he believed he would be reported to police by Aguon and Christine.

Neither did the admission of this evidence constitute an abuse of discretion under Evidence Code section 352. Defendant makes similar assertions regarding undue prejudice as he does regarding the evidence of Hartwell's murder, including that the evidence of his threats to Aguon and Christine was irrelevant and portrayed him as "an evil and out of control person." Those claims are no more availing in this context. Indeed, the testimony regarding the threat to Aguon and Christine was relatively brief and defendant points to no aspect of that testimony that contained potentially inflammatory information such that the evidence was more prejudicial than it was probative. And, as with the evidence of Hartwell's murder, the relevant jury instruction specifically prohibited the jury from

considering the incident as evidence of defendant's "bad character." We hold there was no statutory or constitutional error. (See *People v. Fuiava, supra,* 53 Cal.4th at p. 670; *People v. Foster, supra,* 50 Cal.4th at p. 1335.)

### 3. *Photographs of Hartwell and Noriega and related testimony*

Defendant challenges the admission of testimony related to Hartwell's autopsy as well as photographs of Noriega and Hartwell as unduly prejudicial under Evidence Code section 352. He contends that the admission of this evidence deprived him of his federal right to due process and a fair trial, and that the admission of the photographs prejudiced him at the guilt and penalty phases. We conclude that the trial court did not err by admitting some of the challenged evidence. As to the remaining evidence, we find that any error was harmless.

The prosecution sought to introduce a number of photographs related to Noriega. The court admitted seven photographs of the field where Noriega's body was found; five of those showed (entirely or in part) Noriega's decomposed body. The court also admitted two photographs of Noriega's decomposed body lying on a body bag in a laboratory setting. The court excluded as cumulative two other similar photographs. The court deferred a final ruling regarding a photograph showing the sternum of Noriega's body with an apparent bullet hole, but it ultimately admitted the photo. The prosecution also sought to introduce three photographs of Noriega taken while he was alive. The court indicated it would allow the prosecution to use one of those photographs for witnesses to identify Noriega, and the prosecution selected a photograph of Noriega taken at a restaurant where he worked.

The prosecution also moved to admit various photographs related to Hartwell's murder. The court admitted one photograph of Hartwell talking on the telephone to be used for witnesses to identify her. The prosecution also sought to admit photographs of the burned car inside which Hartwell's body was found. The court admitted five such photographs (two of which showed the area where the car was found, but not the car or Hartwell's body) and excluded another that depicted Hartwell's burned remains inside the car. Finally, the prosecution sought to admit five photographs from Hartwell's autopsy. The court admitted two of those, both of which showed a probe pointing to a stab wound in Hartwell's torso. Bayardo, who performed the autopsy of Hartwell's body, testified that it had been "partially cremated" and described the stab wound depicted in the photographs.

Defendant objects to the admission of the photographs of Noriega and Hartwell depicting them when they were alive, asserting these photographs were irrelevant and evoked undue emotional sympathy. We review the trial court's decision to admit the photographs for abuse of discretion. (*People v. Scully* (2021) 11 Cal.5th 542, 590.) " 'To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282.) Although we have "repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items," we have also held that such photographs can be relevant "to establish the witnesses' ability to identify the victims as the people about whom they were

testifying." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230; see also *People v. Tully* (2012) 54 Cal.4th 952, 1020; *People v. Martinez* (2003) 31 Cal.4th 673, 692.) Here, the photographs of Noriega and Hartwell were used in this permissible manner. Moreover, the photographs were sufficiently neutral and detached such that they were not likely to produce any prejudicial impact. (*People v. Suff* (2014) 58 Cal.4th 1013, 1072–1073.) The trial court did not err by admitting these photographs.

Defendant also objects to the admission of photographs of Noriega's decomposed body and the field where Noriega's body was found. He asserts the photographs were unduly prejudicial, irrelevant, and "unnecessary" because the prosecution could have introduced details regarding Noriega's autopsy by way of testimony rather than photographic evidence. He notes, for example, that it was not disputed at trial that Noriega was shot and that the prosecution's witness could have expressed an opinion regarding the cause of death without showing the photographs.

" 'This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] " ' [M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant' " [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative [citation]. A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " (*People v. Scully*, *supra*, 11

Cal.5th at p. 590.) "In a prosecution for murder, photographs of the murder victim and the crime scene are always relevant to prove how the charged crime occurred . . . ." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1170.) "The prosecution is not obliged to prove its case solely from the testimony of live witnesses; 'the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.' " (*People v. Scully*, *supra*, 11 Cal.5th at p. 590.)

The photographs of the field where Noriega's body was found were relevant to corroborate and illustrate the testimony of the witnesses who discovered and recovered the body. (See *People v. Scully*, *supra*, 11 Cal.5th at pp. 590–591; *People v. Heard* (2003) 31 Cal.4th 946, 973–974.) The manner in which defendant disposed of Noriega's body — leaving it in a field under a pallet where he would decompose over time — was certainly callous. But it cannot be said that the photographs of the field (one of which shows Noriega's body in its entirety) were unduly prejudicial.

We likewise conclude that the photographs of Noriega's decomposed body were not unduly prejudicial. We have stated that "the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant." (*People v. Lewis* (2001) 25 Cal.4th 610, 641.) Defendant's assertion that a witness could have testified regarding Noriega's cause of death without the photographs does not alter our analysis. "That the challenged photographs may not have been strictly necessary to prove the People's case does not require that we find the trial court abused its discretion in admitting them." (*People v. Mills* (2010) 48 Cal.4th 158, 191; see also *People v. Morales* (2020) 10 Cal.5th 76, 104; *People v.*

*Pride* (1992) 3 Cal.4th 195, 243 [prosecution need not "accept antiseptic stipulations in lieu of photographic evidence"].)

The photographs of Noriega's remains were relevant to prove the circumstances of his death and to support the prosecution's case. Further, the photographs assisted the jury in understanding the testimony regarding the manner of death. Ditraglia testified that the hole in Noriega's sternum was consistent with a gunshot wound, corroborating Brown's testimony that defendant shot Noriega. It is true that these photographs and the related testimony are unpleasant and gruesome. But, as we have often said, such photographs are " ' " 'seldom pretty' " ' " and " ' " 'always unpleasant' " ' " (*People v. Scully*, *supra*, 11 Cal.5th at p. 590.) In light of their relevance to the issues here, we cannot say that the photographs were so unduly gruesome or inflammatory such that the trial court abused its discretion in admitting them. (*Id.* at pp. 591–592; see also *People v. Morales*, *supra*, 10 Cal.5th at p. 103; *People v. Montes* (2014) 58 Cal.4th 809, 862; *People v. Howard* (2010) 51 Cal.4th 15, 33.)

Finally, defendant objects to the admission of photographs of Hartwell's burned car, photographs of Hartwell's body, and Bayardo's testimony regarding Hartwell's autopsy. We acknowledge that this evidence, perhaps even more than the photographs of Noriega's body, was unpleasant and gruesome. However, even assuming the trial court abused its discretion by admitting the photographs and related testimony, we find any error harmless under *People v. Watson*, *supra*, 46 Cal.2d 818. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1170 [applying *Watson* to alleged error under Evidence Code section 352 in admitting photographs of victim].) "Under the *Watson* standard, the erroneous admission of a photograph warrants

reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded." (*People v. Scheid* (1997) 16 Cal.4th 1, 21.) We find no such reasonable probability here. Evidence and testimony — including Reeder's testimony and defendant's DNA found in Hartwell's apartment — directly implicated defendant in Hartwell's murder. And, although the challenged photographs corroborated the incriminating evidence, the photographs were not central to the prosecution's case or the jury's ultimate determination of the issues. Thus, even were we to assume there was error in admitting the autopsy photographs and related testimony, we would conclude that there is no reasonable probability that the exclusion of this evidence would have led to a different result at either the guilt or penalty stage.

### 4. *Brown's testimony from defendant's Texas trial*

Defendant contends the trial court erred when it admitted into evidence Brown's testimony from defendant's Texas trial for Hartwell's murder. He maintains the testimony was not admissible under Evidence Code section 1291 because his interest and motive in cross-examining Brown at the Texas trial was not similar to that which he had at his California trial, and that the admission of the testimony violated his rights to confront witnesses, to due process, to an accurate jury determination, and to the protection against cruel and unusual punishment. We conclude the trial court did not err, and that defendant's constitutional rights were not violated.

### a. *Factual background*

Before defendant's trial for the killing of Noriega, the prosecution moved to admit Brown's testimony from defendant's

Texas trial for Hartwell's murder, citing Evidence Code section 1291. The Texas trial consisted of a guilt phase and a penalty phase; during the penalty phase a jury considered evidence and made a sentencing recommendation to the court. Brown testified under oath first outside the presence of the jury at a hearing to determine whether her testimony would be admissible during the penalty phase and later in front of the jury during the penalty phase. Defendant's Texas counsel cross-examined Brown during those proceedings, questioning her about her criminal history, drug use, and prior inconsistent statements to law enforcement about Noriega's death. The prosecution in the Texas case relied on Brown's testimony as a factor in aggravation that warranted a life sentence. Brown died in 2004, before defendant's trial in California.

Defendant objected at his California trial to the admission of Brown's testimony on hearsay and constitutional grounds, asserting that defense counsel in the Texas trial did not have a similar interest and motive to cross-examine Brown. The trial court admitted Brown's testimony, finding that "the motive was actually more than similar. It seemed to me it was darn near identical to what is at issue here, that is, proving that — or at least indicating to the trier of fact there that this witness was not believable." A transcript of Brown's testimony from the Texas case was read to the California jury. Defendant asserts this was error.

### b. *Analysis*

Evidence Code section 1291 provides an exception to the hearsay rule and permits the admission of evidence of former testimony if the declarant is unavailable as a witness and, as relevant here, "[t]he party against whom the former testimony

is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) The interest and motive for cross-examining the witness required under the Evidence Code " ' "need not be identical, only 'similar.' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 333.)[18] We review the trial court's decision to admit Brown's prior testimony for abuse of discretion. (*People v. Sanders* (1995) 11 Cal. 4th 475, 525.)[19]

Defendant does not contest that Brown was unavailable as required by the statute. His sole contention is that the motives and interests concerning cross-examination at the Texas trial and the California trial were not sufficiently similar. He bases his claim on two points, neither of which is persuasive.

First, defendant asserts that counsel in his Texas case did not vigorously cross-examine Brown because defendant had already been convicted of Hartwell's murder, and Brown's testimony likely would have had a "minimal" impact on defendant's sentence. This assertion is unavailing. We have described a defendant's interest and motive in cross-examining

---

[18] We recently considered the scope of the interest and motive exception in the civil context. (*Berroteran v. Superior Court* (2022) 12 Cal.5th 867.) That decision, however, expressly notes that it has no application to criminal cases. (*Id.* at p. 897, fn. 25.)

[19] Defendant asserts de novo review is appropriate because we are applying the law to undisputed facts. However, defendant acknowledges our precedent requires application of an abuse of discretion standard in this context and he provides no reason for us to revisit that determination.

a witness during a preliminary hearing to discredit the witness's testimony establishing the defendant's guilt as "identical" to that which he would have had to cross-examine the witness during trial. (*People v. Zapien, supra,* 4 Cal.4th at p. 975; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1173; *People v. Wharton* (1991) 53 Cal.3d 522, 590.) Here, too, defendant had an interest at both proceedings in discrediting Brown's testimony because it implicated him in Noriega's death. In the Texas proceeding, Noriega's death was used as a factor in aggravation during sentencing; the prosecution in the Texas case urged the jury to impose a life sentence, whereas defendant's counsel sought probation. Thus, defendant had a sufficiently similar interest and motive in cross-examining Brown during the Texas trial: to discredit her testimony in order to avoid a life sentence. The trial court did not abuse its discretion in reaching this conclusion.

Second, defendant contends counsel likely wanted to avoid a lengthy cross-examination of Brown in the Texas proceeding to avoid inflaming the jury, and that the alleged brevity of cross-examination supports that position. But the requirement that a defendant have a similar interest and motive to cross-examine is satisfied even when the cross-examination that actually occurred "might have been more effective." (*People v. Samayoa* (1997) 15 Cal.4th 795, 851; *People v. Carter, supra,* 36 Cal.4th at pp. 1173–1174.) As explained below, the cross-examination that took place in defendant's Texas prosecution further supports the conclusion that there was no error here.

In an attempt to avoid a term of life in prison, defendant's counsel in Texas cross-examined Brown by attacking her credibility and seeking to impeach her testimony. Counsel probed Brown's criminal history, her admitted involvement in

selling narcotics, and her status on parole. Counsel elicited testimony from Brown that she had made prior inconsistent statements about Noriega's death, and that she was likely under the influence of methamphetamine when Noriega was killed. Counsel attempted to impeach Brown by asking whether she received any promises of leniency from law enforcement in exchange for her testimony, and elicited an admission from Brown that she lied to one detective to "beef up the story enough" to avoid jail and that she "conjured up some of" her prior statements. Although defendant contends the amount of time counsel spent cross-examining Brown was "meager," counsel's areas of inquiry illustrate that the interest and motive in cross-examining Brown was sufficiently similar to support the admission of Brown's testimony at the California trial.

Defendant's constitutional claims fare no better. He asserts the admission of Brown's testimony violated his state and federal right to due process and rendered his trial fundamentally unfair, violated his right to an accurate jury determination under the Sixth and Fourteenth Amendments, resulted in cruel and unusual punishment, and violated his right to confrontation under the Sixth and Fourteenth Amendments. Having concluded that the trial court properly admitted Brown's testimony, we cannot say there was any violation of defendant's constitutional rights. (See *People v. Fuiava, supra,* 53 Cal.4th at p. 670 [proper admission of evidence under state law does not violate constitutional right to fair trial]; *People v. Lindberg* (2008) 45 Cal.4th 1, 26 [application of rules of evidence generally does not impermissibly infringe on a defendant's constitutional rights]; *People v. Wilson* (2005) 36 Cal.4th 309, 340 [Evidence Code section 1291 codifies the traditional exception to the Sixth Amendment regarding

unavailable witnesses when the defendant has had a prior opportunity to cross-examine]; *People v. Carter*, *supra*, 36 Cal.4th at p. 1172, citing *United States v. Owens* (1988) 484 U.S. 554, 559.)

## C. Claims Regarding Special Circumstance Allegations

### *1. Robbery-murder special circumstance*

Defendant contends the robbery-murder special circumstance, and therefore the guilt and penalty phase judgments, must be reversed because there was insufficient evidence to support the jury's finding that defendant harbored an independent felonious purpose to rob Noriega. We conclude there was sufficient evidence to support the jury's finding.

" 'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 89.) " 'This standard of review applies when the evidence is largely circumstantial and to review of special circumstance findings.' " (*Ibid.*)

"When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is ' "whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." ' [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence." (*People v. Lindberg, supra*, 45 Cal.4th at p. 27.) " ' " 'If the

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 104.) "A reviewing court neither reweighs the evidence nor reevaluates a witness's credibility." (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 27.) Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A robbery-murder special circumstance requires a finding that the "murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" a "[r]obbery in violation of Section 211 or 212.5." (§ 190.2, subd. (a)(17), (a)(17)(A).) "[I]f the murder furthers the robbery or attempted robbery, the special circumstance is satisfied. But, if the robbery or attempted robbery simply furthers or facilitates the murder, it is not, because the robbery's 'sole object is to facilitate or conceal the primary crime.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490–491.) "[T]he special circumstance . . . requires that the murder be committed 'in order to advance [the] independent felonious purpose' of robbery . . . ." (*People v. Burney* (2009) 47 Cal.4th 203, 253.) In other words, "[t]he robbery must not be 'merely incidental' to the commission of the murder." (*People v. Clark* (2011) 52 Cal.4th 856, 947.) A concurrent intent to rob and to kill will support the special circumstance allegation: "The question is 'whether the defendant had a "purpose for the [robbery] apart from

murder." ' " (*People v. Hardy*, *supra*, 5 Cal.5th at p. 89; see also *People v. Davis*, *supra*, 46 Cal.4th at p. 609.)

" ' "[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." [Citation.] And, significantly, we have observed that "[i]f a person commits a murder, *and after doing so takes the victim's wallet*, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money." ' " (*People v. Hardy*, *supra*, 5 Cal.5th at p. 91; see also *People v. Thompson* (2010) 49 Cal.4th 79, 126 [upholding robbery murder special circumstance when defendant planned to rob victim "as part of a larger plan to obtain his possessions after killing him"].)

Applying these principles here, we conclude that sufficient evidence supports the jury's true finding concerning the robbery-murder special circumstance. Brown's testimony revealed that defendant and Noriega exchanged words in Spanish, Noriega retrieved a green bag from the trunk of his car, and defendant shot Noriega. Defendant retrieved the green bag, and then he hid Noriega's body. Sams testified that, when defendant lived in Texas years later, defendant bragged that he had shot someone in California "[f]or drugs," and that he had taken a "bag" of speed.

In short, defendant and Noriega spoke before Noriega retrieved the drugs from his trunk; defendant then shot him and took the drugs. The jury could reasonably infer from this series of events that defendant intended to rob Noriega independent of any intent to kill him. Unlike in *People v. Green*, when the defendant "took his victim's clothing for the purpose of burning

it later to prevent identification," and we held the "sole object [of the robbery was] to facilitate or conceal the primary crime" (*People v. Green* (1980) 27 Cal.3d 1, 61), there is no evidence here that defendant took the drugs to facilitate or conceal Noriega's murder.

Defendant asserts that sufficient evidence does not support the robbery-murder special circumstance because the prosecutor argued, and the evidence supported, that defendant killed Noriega because he believed Noriega was a "narc, a snitch." Defendant emphasizes that Brown denied that the purpose of meeting Noriega was to rob and kill him, and that Reeder testified that defendant said he killed Noriega because Noriega was a "narc." Thus, defendant contends, "[t]he overwhelming weight of the evidence established that [defendant] shot Noriega to silence him. The motive for the crime was clearly not robbery."

As defendant acknowledges, the prosecution argued *both* that defendant killed Noriega because defendant believed Noriega was a "narc" and that defendant had "dual motives, murder and robbery, pain and profit, freedom and financial gain." If defendant harbored a concurrent intent to rob Noriega and to kill him because he was a narc, that is sufficient to support the robbery-murder special circumstance. (*People v. Clark*, *supra*, 52 Cal.4th at pp. 947–948 ["evidence that defendant harbored concurrent intents to rape *and* kill [does not] render the robbery merely incidental to the murder"]; *People v. Michaels* (2002) 28 Cal.4th 486, 518 [upholding robbery-murder special circumstance when defendant killed victim to protect defendant's girlfriend from abuse and for independent purpose of stealing victim's property].) It is true that Brown denied that the purpose of meeting Noriega was to

rob and kill him. But the jury could have concluded from the evidence that defendant intended to rob and kill Noriega even if the jury concluded Brown did not intend to do so. And, in any event, the jury was free to evaluate Brown's testimony and to deem it credible or not. As a reviewing court, our role is not to reweigh the evidence. (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 27.) And although defendant asserts the motive "was clearly not robbery," Brown's description of the murder — including that defendant waited to shoot Noriega until after Noriega had produced the bag of drugs, and then defendant took the drugs — and defendant's later statements recounted by Sams that he shot someone "for drugs" provided ample evidence to support the jury's verdict. We therefore conclude sufficient evidence supported the jury's true finding.

### 2. *Use of Texas conviction to support prior murder conviction special circumstance*

Defendant contends the special circumstance finding based on his prior murder conviction must be reversed because the Texas conviction did not meet the requirements of section 190.2, subdivision (a)(2). That statute requires a defendant to have been "convicted previously of murder in the first or second degree." (§ 190.2, subd. (a)(2).) A conviction from another jurisdiction meets the requirements for the prior murder conviction special circumstance if the offense would be punishable in California as first or second degree murder. (*Ibid*.) Defendant was convicted of murder in Texas. The jury in that case returned a general verdict of guilty on an indictment charging defendant with murder under a theory that he either "intentionally or knowingly cause[d] the death of an individual" or "intend[ed] to cause serious bodily injury and commit[ted] an

act clearly dangerous to human life that cause[d] the death of an individual." (Tex. Pen. Code Ann. § 19.02(b)(1), (b)(2).)

Defendant asserts that because the Texas jury was instructed on both theories, the California special circumstance statute demands that the least adjudicated elements of the Texas conviction required a showing equal to California's implied malice second degree murder. He claims that burden has not been met here because he could have been convicted under the Texas murder statute if the jury believed he had intended to cause serious bodily injury without also finding he subjectively knew he was committing an act dangerous to human life, whereas under California law implied malice requires a showing that a defendant acted with conscious disregard of the danger to human life. Although we have held that a conviction under Texas Penal Code section 19.02(b)(1) constitutes at least implied malice second degree murder under California law and thus satisfies the prior murder special circumstance (*People v. Martinez, supra*, 31 Cal.4th at pp. 687–688), we have not previously addressed Texas Penal Code section 19.02(b)(2).

We decline to address the merits of defendant's claim because it is apparent that any error was undoubtedly harmless.[20] Defendant asserts that the California jury would not have returned a death verdict absent evidence he had been

---

[20] One Court of Appeal has held that a conviction under Texas Penal Code section 19.02(b)(2) does not necessarily require a subjective awareness of the risk of death, whereas a conviction under California law for implied malice murder does. (*People v. Carothers* (2017) 13 Cal.App.5th 459, 467–468.) We express no view regarding whether *Carothers* was correctly decided.

convicted of murder in Texas. But defendant's prior murder conviction would have been admissible during the penalty phase as a factor in aggravation, even if the prior conviction could not support a prior murder special circumstance. (§ 190.3, factor (b) ["criminal activity by the defendant which involved the use or attempted use of force or violence"].) That is because defendant does not challenge the admissibility of his prior conviction generally, nor does he challenge the fact that he was convicted of murder under Texas law. Rather, he contends that the Texas conviction would not have amounted to first or second degree murder in California, and therefore it could not support the prior murder conviction special circumstance. "As the United State Supreme Court recognized in *Brown v. Sanders* (2006) 546 U.S. 212, the invalidation of a special circumstance does not require reversal of the death sentence under California's statutory scheme if 'one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.'" (*People v. Hajek and Vo, supra*, 58 Cal.4th at p. 1186.)

The prosecution here relied on the prior murder conviction during the penalty phase not simply to show that defendant had been convicted of a murder that would have been classified as a murder in California, but also to explain and give context to the underlying nature of defendant's behavior when he stabbed Hartwell. "Because the [allegedly] invalid [prior murder] special circumstances 'did not alter the universe of facts and circumstances to which the jury could accord . . . weight' [citation], and because '[t]here is no likelihood that the jury's consideration of the mere existence of the [prior murder] special circumstance tipped the balance toward death' [citation], the invalidity of the [prior murder] special circumstances does not

warrant reversal of the death sentence." (*People v. Hajek and Vo, supra*, 58 Cal.4th at pp. 1186–1187, fn. omitted.)

Further, even if we were to set aside the prior murder conviction special circumstance finding, the error would not require reversal of defendant's guilt verdict or penalty determination. The jury also found true the robbery-murder special circumstance, which (as discussed in section II.C.1, *ante*) was supported by sufficient evidence and provides an independent basis to support defendant's guilt verdict and death judgment. (See *People v. Hajek and Vo, supra*, 58 Cal.4th at p. 1186 [reversal of lying-in-wait special circumstance did not require reversal of judgment when, as relevant here, a valid special circumstance for torture murder remained].)

## D. Claims Regarding Jury Instructions

### 1. Instruction regarding second degree murder

Defendant contends the trial court erred when instructing the jury by failing to adequately define second degree murder. He asserts the provided instructions did not tell the jury that an intentional killing committed with express malice could constitute second degree murder, and that the provided instructions thus were "the functional equivalent of failing to instruct at all on second degree murder." We conclude there was no error.

As an initial matter, the Attorney General asserts defendant's claim is forfeited because he did not object to the instructions at trial nor did he request that the instructions be modified. (See *People v. Hillhouse, supra*, 27 Cal.4th at p. 503 ["A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial"].) A failure

to object, however, does not prevent a defendant from challenging an instruction on appeal if the asserted error affected the defendant's substantial rights. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1000, citing § 1259.) Assuming the claim was preserved, we conclude that it fails on its merits.

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Defendant's claim requires an evaluation of " ' "the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' " (*Ibid.*) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Applying these principles, we hold that the instructions provided an adequate instruction concerning second degree murder and that there was no error.

The prosecution did not pursue a theory of implied malice murder. Accordingly, the jury was instructed on only express malice and felony murder theories. The instruction defining murder provided that defendant was guilty of murder if he acted with "express malice aforethought," requiring that defendant "unlawfully intended to kill." The jury thus was told that defendant committed murder if he acted with express malice — an unlawful intent to kill. The instructions further defined the degrees of murder, stating that first degree murder required "that [defendant] acted willfully, deliberately, and with premeditation." And, crucially, the jury was instructed that

"[a]ll other murders except felony murder are of the second degree."

Defendant's position — that the jury would not have understood that if defendant acted with express malice and intended to kill Noriega he could be guilty of second degree murder as well as first degree murder — is unavailing in light of the instructions provided. The jury was told that express malice and intent to kill were required to support a murder conviction, and if the jury concluded murder had occurred it must also consider whether the murder was first or second degree. This was sufficient to inform the jury that if it found defendant acted with express malice it could convict him of first degree murder (if it also concluded he acted willfully, deliberately, and with premeditation) or second degree murder (if the jury concluded he did not act willfully, deliberately, and with premeditation).

Defendant's reliance on *People v. Rogers* (2006) 39 Cal.4th 826 is misplaced. In *Rogers*, the jury was instructed on first degree murder, second degree murder, and voluntary manslaughter. (*Id.* at p. 866.) The instructions explained that murder could be supported by express or implied malice, that first degree murder required the defendant to act willfully, deliberately, and with premeditation, and that murder with implied malice could "also" constitute second degree murder. (*Ibid.*; see *id.* at pp. 866–867.) The trial court did not, however, explain that a murder committed with express malice could constitute second degree murder. (*Id.* at p. 867.) We held this to be error because it "created an obvious gap in the instructions that was not filled by any of the other instructions given." (*Ibid.*)

No such gap exists here. Unlike *Rogers*, the jury in defendant's case was not instructed on implied malice as a theory of murder generally, or on implied malice as a theory of second degree murder specifically. The jury was therefore not presented with instructions that explained one theory of liability for second degree murder but not another. Considering the instructions as a whole, there is no basis to conclude that the jury misunderstood or misapplied these instructions, let alone a reasonable likelihood that any error occurred. We conclude that the trial court did not err in providing the given instructions.

### 2. *Instruction on provocation*

Defendant contends the trial court erred by failing to instruct the jury, on its own motion, that provocation is relevant to determine whether a murder is committed willfully, deliberately, and with premeditation. He asserts that Brown's testimony that defendant and Noriega had a "heated argument" preceding the shooting would support a finding of provocation here that would reduce defendant's culpability from first degree murder to second degree murder.

Defendant is correct that provocation may reduce murder from first degree to second degree. (*People v. Rivera* (2019) 7 Cal.5th 306, 328.) As we have stated, however, "an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as CALJIC No. 8.73 or CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory." (*People v. Rivera*, *supra*, 7 Cal.5th at p. 328.) Crucially, a "trial court is not required to give such an instruction sua sponte." (*Ibid*.) Here, as defendant

acknowledges, he did not request such an instruction. Thus, like in *Rivera*, the trial court did not err by failing to instruct the jury concerning provocation. (*Id.* at p. 329.)

Defendant acknowledges our precedent on this point but asserts we should overrule *Rogers* and hold that there is a duty to instruct on provocation because the absence of provocation is effectively an element of first degree murder. He contends *Rogers* is inconsistent with the high court's decision in *Mullaney v. Wilbur* (1975) 421 U.S. 684, a case that he characterizes as holding that one element of first degree murder is a *lack* of provocation.

Defendant misreads *Mullaney*. That decision held that a defendant's due process rights are violated when the jury is instructed that, if the prosecution established a homicide was intentional and unlawful, malice would be implied *unless* the defendant proved by a preponderance of the evidence that he or she "acted in the heat of passion on sudden provocation." (*Mullaney*, *supra*, 421 U.S. at p. 686, fn. omitted.) But *Mullaney* did not hold that there is a duty to instruct on provocation in all cases. Rather, the high court held the error in that case occurred because the jury instructions shifted the burden of proof to the defendant to prove that the killing occurred in the heat of passion. (*Id.* at p. 701; see also *Francis v. Franklin* (1985) 471 U.S. 307, 317 [*Mullaney* "held unconstitutional a mandatory rebuttable presumption that shifted to the defendant a burden of persuasion on the question of intent"]; *Patterson v. New York* (1977) 432 U.S. 197, 215 ["*Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense"].)

*Mullaney* thus is not inconsistent with *Rogers* or our subsequent cases holding that instructions on issues such as provocation or accident amount to pinpoint instructions that are " 'required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 675.) We therefore hold, consistent with *Rogers* and *Rivera*, that the trial court here did not err by failing to provide an instruction on provocation when one was not requested by defendant at trial.

### 3. *Instruction on self-defense, heat of passion, and unreasonable self-defense*

Defendant contends the trial court erred by denying his requests to instruct the jury on perfect self-defense, imperfect self-defense, and voluntary manslaughter based on heat of passion. He asserts this error violated his state and federal constitutional rights to due process, as well as the Eighth and Fourteenth Amendments. We conclude the trial court did not err by refusing to give the requested instructions because there was not substantial evidence to support a theory of self-defense or heat of passion.

Defendant requested instructions on self-defense, imperfect self-defense, and voluntary manslaughter based on heat of passion. He asserted: "One possible interpretation in Dorothy Brown's testimony could be sort of that there was some provocation, there was . . . either a drug deal gone bad, or [Noriega] pulled a firearm, something like that. There's an insinuation of the statements of [defendant] and Mr. Silva. They're primarily from Mr. Silva, obviously." The court declined to give the instructions, noting that the evidence in the record did not support them. The court also stated that it would

72

reconsider its ruling if defendant presented additional evidence to support his theory.

"[A] trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)  " 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial — that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' " (*People v. Burney*, *supra*, 47 Cal.4th at p. 250.)  "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.)  "We review independently whether the trial court erred in rejecting an instruction on a lesser included offense." (*People v. Steskal* (2021) 11 Cal.5th 332, 345.)

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  A killing in perfect self-defense is justifiable homicide.  (*People v. Randle* (2005) 35 Cal.4th 987, 994, disapproved on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)  Perfect self-defense requires that "one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury." (*People v. Randle, supra*, 35 Cal.4th at p. 994; see also *People v. Simon, supra*, 1 Cal.5th at p. 132.)  "To satisfy the imminence requirement, '[f]ear of future harm — no matter how great the fear and no matter how great the likelihood of the harm — will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.' " (*People v. Trujeque* (2005) 61 Cal.4th 227, 270.)  " ' "[T]he peril must appear to the defendant as immediate and present and not

73

prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ' " (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

Imperfect self-defense, on the other hand, "occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death." (*People v. Simon, supra,* 1 Cal.5th at p. 132.) Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice. (*Ibid.*)

Finally, " '[h]eat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citation.] Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' [Citation.] A heat of passion killing, we have explained, is one caused by an unconsidered reaction to provocation rather than the result of rational thought. If reason ' " 'was obscured or disturbed by passion' " ' to so great a degree that an ordinary person would ' " 'act rashly and without deliberation and reflection,' " ' we have concluded that killing arose from ' " 'passion rather than from judgment.' " ' " (*People v. Vargas* (2020) 9 Cal.5th 793, 827–828.)

Defendant focuses on three facts to support his position that self-defense and manslaughter instructions were required: a loaded gun was found in Noriega's vehicle; Noriega was a drug dealer known to be armed; and Investigator Silva testified that Brown told him there was a "heated argument" between Noriega and defendant before the shooting. None of these circumstances

nor any others in the record amount to substantial evidence requiring the instructions.

As an initial matter, defendant errs in relying on Brown's statement to Silva that there was a heated argument between Noriega and defendant prior to the shooting. As discussed in section II.D.6, *post*, the jury was instructed that it could use Brown's statements to Silva only "in deciding whether to believe the testimony of Dorothy Brown that was read here at trial." The jury was instructed it "may not use those other statements as proof that the information contained in them is true, nor may you use them for any other reason." Defendant therefore cannot rely on Brown's statements to Silva to establish the requisite substantial evidence to support the requested instructions. Further, Brown's testimony in the Texas trial did not describe any argument between defendant and Noriega. Rather, she testified at various points that: defendant got out of his truck and "yelled something over to" Noriega; that defendant "said something to him"; that "[Noriega] got out and moved to the back of the vehicle and opened the trunk"; and that defendant and Noriega were "speaking in Spanish" and "exchanged words in Spanish."

There was no evidence defendant actually believed — reasonably or unreasonably — that he was in imminent fear of death or great bodily injury. Although Noriega carried a loaded firearm in his car, there is no evidence Noriega reached for the gun at any point or that defendant knew about the gun or believed Noriega had a gun on his person. Nor is there evidence defendant believed Noriega was an imminent threat that he needed instantly to deal with. Defendant did not testify and "there is no evidence he ever told anyone that he had acted out of fear." (*People v. Simon, supra,* 1 Cal.5th at p. 134; see also

*People v. Steskal*, *supra*, 11 Cal.5th at p. 346.) Simply put, there was not substantial evidence to support instructions on self-defense.

Nor is there evidence that defendant shot Noriega in the heat of passion. Again, defendant relies on Brown's statement to Silva that a "heated argument" preceded the shooting. But Brown's statements, at most, established that after the verbal exchange Noriega went to the trunk of his car and produced a duffel bag of narcotics. Only then did defendant retrieve his firearm and shoot Noriega. This does not constitute substantial evidence that defendant acted in the heat of passion when he shot Noriega.

We rejected a similar claim in *People v. Landry* (2016) 2 Cal.5th 52. There, the defendant stabbed and killed another inmate at a prison. (*Id*. at p. 63.) The trial court denied the defendant's request for instructions on imperfect self-defense and heat of passion. (*Id*. at p. 97.) In support of the instructions, the defendant pointed to a witness's testimony that the defendant and victim were " 'having words' just before" the attack. (*Id*. at p. 98.) We noted, however, that the witness's belief that the defendant and victim were arguing was "based solely on the tone of defendant's voice, which 'sounded angry.' " (*Ibid*.) The witness "did not hear what the two men were saying to each other." (*Ibid*.) And although the defendant relied on a letter he had written stating the victim had threatened him, that letter "did not identify when the alleged threat occurred." (*Ibid*.) We held that "[t]his evidence, even if credited, does not begin to demonstrate either provocation for purposes of heat of passion voluntary manslaughter or imminence of danger of death for purposes of imperfect self-defense voluntary manslaughter." (*Ibid*.)

Like in *Landry*, the only evidence supporting a self-defense or heat of passion theory was Brown's statement that an argument occurred between defendant and Noriega. But that evidence was inadmissible for the truth of the matter. Further, Brown's characterization of the exchange was based solely on the tone of voices involved; Brown did not testify that she understood Spanish, and she did not testify further about the content of the exchange. Although the verbal exchange in *Landry* occurred "just before" the attack (*People v. Landry*, *supra*, 2 Cal.5th at p. 98), the conversation and the shooting in this case were separated somewhat by Noriega retrieving the bag from his trunk. The evidence of provocation here is thus even weaker than the facts we considered in *Landry*.

We therefore conclude the trial court did not err when it denied defendant's requests to instruct the jury on self-defense, imperfect self-defense, or voluntary manslaughter in heat of passion.

### 4. *Failure to instruct on theft as a lesser included offense of robbery*

Defendant contends the robbery-murder special circumstance allegation and his murder conviction based on a theory of felony murder must be reversed because the trial court failed to instruct the jury that theft was a lesser included offense of robbery. He asserts the trial court had a duty to instruct the jury on theft as a lesser included offense even though robbery was not charged as a separate offense. We have repeatedly rejected similar claims, and we do so again here.

Defendant was charged with first degree murder. A robbery-murder special circumstance was alleged. The prosecution argued that the murder was premeditated and that

it also constituted felony murder. Although both the felony murder theory and the robbery-murder special circumstance were based on the theory that defendant robbed Noriega, robbery was not charged as a separate felony offense. Defendant did not request any instruction at trial related to theft. He contends on appeal that the trial court had a sua sponte duty to instruct the jury that theft was a lesser included offense of robbery.

As defendant acknowledges, we have repeatedly rejected his position. A trial court has a duty to instruct on lesser included offenses that "find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) However, we have held that a court's duty to instruct on lesser included offenses "does not extend to *uncharged* offenses relevant only as predicate offenses under the felony-murder doctrine." (*People v. Silva* (2001) 25 Cal.4th 345, 371.) In *Valdez*, we stated that "when robbery is not a charged offense but merely forms the basis for a felony-murder charge and a special circumstance allegation, a trial court does not have a sua sponte duty to instruct the jury on theft." (*People v. Valdez*, *supra*, 32 Cal.4th at pp. 110–111; see also *People v. Gonzalez* (2018) 5 Cal.5th 186, 204–205 [same]; *People v. Brooks* (2017) 3 Cal.5th 1, 77 [same]; *People v. Kelly* (2007) 42 Cal.4th 763, 792 [same].)

Defendant acknowledges these precedents but asserts that the United States Supreme Court's decision in *Beck v. Alabama* (1980) 447 U.S. 625 requires a different result. At issue in *Beck* was Alabama's death penalty statute, which prohibited a trial court from providing an instruction regarding a lesser included offense, thus allowing a jury only to impose the death penalty or to acquit the defendant. (*Beck*, *supra*, 477 U.S.

at pp. 627–628.) The high court held that instructing the jury on a lesser included offense is required if the failure to do so would leave the jury without a third option (i.e., to convict the defendant of a lesser offense), enhancing the risk of an unwarranted conviction as a result. (*Id.* at p. 645.) The Court explained that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case." (*Id.* at p. 638, fn. omitted.)

We have previously held that *Beck* does not require the instruction defendant now seeks. (*People v. Valdez, supra,* 32 Cal.4th at pp. 118–119.) Unlike the Alabama statute at issue in *Beck,* "California does not preclude a trial court from giving instructions on lesser included offenses in capital cases." (*Ibid.*) Thus, *Beck* is not implicated "because the 'jury was not forced into an all-or-nothing choice between a conviction of murder that would *legally compel it to fix the penalty at death,* on the one side, and innocence, on the other: Even if it found [the defendant] guilty of [felony murder under the special circumstance allegations], it was not legally compelled to fix the penalty at death, but could fix it instead at a term of imprisonment for life without possibility of parole.' " (*People v. Valdez, supra,* 32 Cal.4th at p. 119; see also *People v. Cash* (2002) 28 Cal.4th 703, 738.) Defendant presents no compelling reason to revisit these decisions.

Defendant further alleges that a lesser included offense instruction for an uncharged felony used as the basis for a felony-murder charge and a special circumstance allegation is required by *Alleyne v. United States* (2013) 570 U.S. 99, *Apprendi v. New Jersey* (2000) 530 U.S. 466, and related cases.

In *Alleyne*, the high court stated that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." (*Alleyne, supra,* 570 U.S. at pp. 114–115.) Essentially, defendant asserts that these cases stand for the proposition that facts which increase a defendant's punishment must be found by a jury, that special circumstance allegations which make a defendant eligible for the death penalty are elements of a capital murder charge, and therefore that a special circumstance allegation should be treated as the "functional equivalent" of an aggravating factor. Thus, defendant asserts, because a court is required to provide a lesser included offense instruction on a charged offense it should also be required to provide a lesser included offense instruction on an uncharged offense supporting a felony murder charge or special circumstance allegation. Stated differently, defendant's position is that: (1) charged offenses require the provision of lesser included offense instructions; (2) *Alleyne* held that a fact which aggravates punishment forms "a constituent part of a new offense"; (3) a special circumstance aggravates punishment and thus forms a constituent part of a charged offense (even if the offense itself is uncharged); and (4) therefore a special circumstance allegation requires the provision of a lesser included offense instruction.

Defendant overreads the high court's decisions in this area. The court explained in *Alleyne* that the Sixth Amendment "provides that those 'accused' of a crime have the right to a trial 'by an impartial jury,' " and "[t]his right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." (*Alleyne, supra,* 570 U.S. at p. 104.) "Other than the fact of a prior conviction,

any fact that increases the penalty for a crime beyond the prescribed statutory maximum" constitutes an element of the crime that "must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) *Alleyne* went further, holding that any fact which increases a mandatory minimum also "constitutes an 'element' or 'ingredient' of the charged offense" and thus must be submitted to the jury and proved beyond a reasonable doubt. (*Alleyne*, *supra*, 570 U.S. at p. 107.)

Consistent with *Alleyne*, the question of whether defendant committed robbery was submitted to the jury and found true by the jury beyond a reasonable doubt. But neither *Apprendi*, *Alleyne*, nor any of the cases defendant cites require a trial court to instruct on a lesser included offense in these circumstances. Nor does such a conclusion logically follow from *Alleyne*. Defendant cites to no authority that has extended or applied *Alleyne* in this manner, and we decline to do so in the first instance.

Finally, defendant contends the equal protection clause required the trial court to instruct the jury on the lesser included offense of theft. He asserts that a trial court has a sua sponte duty to instruct on a lesser included offense in a non-capital prosecution, and therefore that the same requirement should extend to defendants in capital trials. He is mistaken. As we stated in *Cash*, "California requires a sua sponte instruction on lesser included *charged offenses* regardless of whether the case is a capital, or a noncapital, one." (*People v. Cash*, *supra*, 28 Cal.4th at p. 738.) Similarly, there is no equal protection violation resulting from the rule that a lesser included offense instruction need not be provided when an uncharged offense

forms the basis for a felony-murder charge and a special circumstance allegation. (*Id*. at pp. 737–738.)

### 5. *Instruction regarding corroboration of accomplice testimony*

Defendant contends the instruction regarding accomplice testimony (a modified version of CALCRIM No. 334) improperly lowered the prosecution's burden of proof in violation of his right to due process and a fair jury trial. The instruction directed the jury that if it determined Brown was an accomplice, her testimony could be used to convict defendant only if: it was "supported by other evidence that you believe"; that the "supporting evidence is independent of the accomplice's testimony"; and the "supporting evidence tends to connect the defendant to the commission of the crime." The instruction further provided:

> Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the accomplice testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

Defendant contends the language in the instruction indicating that "slight" evidence which "tend[s] to connect the defendant to the commission of the crime" impermissibly undermined the general reasonable doubt instruction and allowed for the jury to convict him based on a standard lower than proof beyond a reasonable doubt.

As defendant acknowledges, we have consistently rejected his position. In *Bryant*, we stated that a similar instruction "did not convey to the jury that it 'could convict if there was slight corroboration.' Instead, the instruction properly explained the corroboration requirement as it related to the jury's consideration of accomplice testimony. The challenged instruction in no way lowered the prosecution's burden of proof." (*People v. Bryant, supra*, 60 Cal.4th at p. 434; see also *People v. Frye* (1998) 18 Cal.4th 894, 968.) Here, too, the jury was instructed that it was required to find defendant guilty beyond a reasonable doubt. The accomplice testimony instruction described for the jury how it was to evaluate Brown's testimony but it did not address, modify, or undermine the general instruction regarding reasonable doubt. Defendant presents no compelling reason for us to revisit the issue.

### 6. *Instructions regarding Brown's extrajudicial statements*

Defendant contends the trial court erred when instructing the jury regarding how to evaluate Brown's prior testimony and her statements to Silva. He asserts CALCRIM No. 318, which instructed the jury it could use a witness's prior statements to evaluate their subsequent testimony, failed to tell the jury it was free to disbelieve Brown's prior testimony. He further asserts CALCRIM No. 319, which instructed the jury it could consider Brown's statements to Silva only to evaluate Brown's prior testimony, improperly precluded the jury from considering Brown's statements to Silva as true. We conclude there was no error in providing the instructions.

As an initial matter, the Attorney General asserts defendant's claim is forfeited because he did not object to either instruction at trial nor did he request the instructions be

modified. As observed above, however, failure to object does not prevent a defendant from challenging an instruction on appeal if the asserted error affected the defendant's substantial rights. (*People v. Ramirez, supra*, 10 Cal.5th at p. 1000; § 1259.) Assuming the claim was preserved, we conclude that it fails on its merits.

As previously noted, Brown was deceased at the time of defendant's trial. Her testimony from defendant's Texas murder trial was read into the record during defendant's trial in California. Defendant also introduced testimony from Silva regarding statements Brown made to him during a custodial interview in 1998.

The trial court instructed the jury with CALCRIM No. 318 and No. 319. As modified by the court with agreement of the parties, CALCRIM No. 318 provided:

> "You have heard evidence of statements that a witness made before trial. Except as otherwise instructed, if you decide that the witness made those statements, you may use those statements in two ways:
>
> 1.    To evaluate whether the witness's testimony in court is believable;
>
> AND
>
> 2.    As evidence that the information in those earlier statements is true."[21]

---

[21]    The agreed upon modification added the phrase "except as otherwise instructed."

The trial court also instructed the jury with a modified version of CALCRIM No. 319. As modified and agreed upon by the parties, the instruction stated:

> "Dorothy Brown did not testify in this trial, but her testimony, taken at another time, was read for you. In addition to this testimony, you have heard evidence that Dorothy Brown made other statements. I am referring to the statements about which Martin Silva testified.

> "If you conclude that Dorothy Brown made those other statements, you may only consider them in a limited way. You may only use them in deciding whether to believe the testimony of Dorothy Brown that was read here at trial.

> "You may not use those other statements as proof that the information contained in them is true, nor may you use them for any other reason."

Defendant asserts there is a reasonable likelihood the jury interpreted these instructions to mean that it was compelled to accept Brown's out-of-court statements as true. He maintains that CALCRIM No. 318 was "one sided" and effectively deprived him of a fair trial because it directed the jury to accept Brown's testimony from the Texas trial as fact. At the same time, he contends the instructions were confusing and contradictory because CALCRIM No. 318 allowed the jury to consider Brown's statements to Silva for their truth, but CALCRIM No. 319 told the jury it could not consider Brown's statements to Silva for their truth. Further, defendant claims the instructions prevented the jury from considering Brown's statements to Silva that defendant and Noriega were arguing in Spanish before the shooting occurred. This limitation, he insists, prevented the

jury from fairly considering defendant's claim that the killing occurred out of provocation and thus constituted second degree murder.

Defendant's contentions are unpersuasive. As a preliminary matter, CALCRIM No. 318 did not pertain to Brown's statements to Silva. As the prosecutor noted, the language "[e]xcept as otherwise instructed" was added to CALCRIM No. 318 to avoid implying that the instruction referred to Brown's statements to Silva: "The only thing I might suggest is adding at the very beginning, 'except as otherwise instructed,' because the next instruction is going to give different information concerning Dorothy Brown." CALCRIM No. 319 was specific to Brown's statements to Silva, and it instructed the jury how it was to consider those statements; CALCRIM No. 318 dealt with prior statements given by other witnesses, and the court instructed the jury that Brown's testimony from the Texas trial was to be evaluated by the same standards applied to other witnesses. CALCRIM No. 317 provided: "The testimony that Dorothy Brown has given under oath was read to you because she is not available. You must evaluate this testimony by the same standards that you apply to a witness who testified here in court."

We have previously rejected claims that an instruction informing the jury it may consider whether testimony is true is improper if it does not also tell the jury it may consider whether the testimony is false. (See *People v. Friend* (2009) 47 Cal.4th 1, 41–42.) This is equally true in the context of CALCRIM No. 318, and particularly so when the jury was instructed, as it was here with CALCRIM No. 226, to consider factors indicating that testimony was not trustworthy and instructed that it could "believe all, part, or none of any witness's testimony." Moreover,

as previously noted, the jury was instructed in CALCRIM No. 317 to consider Brown's prior testimony from Texas "by the same standards" applicable to other witnesses. We evaluate the jury instructions as a whole, "not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753–756.) Considering the totality of the instructions provided to the jury, we conclude that defendant has not established error or a reasonable likelihood that the jury applied CALCRIM No. 318 in an improper manner.

We further hold that CALCRIM No. 319 properly limited the jury's consideration of Brown's statements to Silva. That instruction informed the jury that it could consider those statements to evaluate Brown's testimony at the Texas trial but it could not consider those statements for their truth. Defendant asserts Brown's statements to Silva should have been considered for their truth. He acknowledges, however, that defense counsel indicated to the court that Silva would testify "on some impeachment issues." This makes sense, given that Brown's statements to Silva amounted to hearsay and were thus governed by Evidence Code section 1202. That statute states: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." (Evid. Code, § 1202.) Accordingly, Brown's hearsay statements to Silva could not be considered for their truth.

Defendant identifies no plausible basis for admitting Brown's statements for their truth. He simply asserts, quoting *People v. Chism* (2014) 58 Cal.4th 1266, 1305: " 'Unless evidence is admitted for a limited purpose, or against a specific party, evidence admitted at trial may generally be considered for any purpose.' " As noted, however, counsel stated Silva's testimony would serve as impeachment. As such, defendant cannot now assert it was admitted for its truth, particularly in light of the rules limiting hearsay. CALCRIM No. 319 was therefore a correct instruction.

## III. PENALTY PHASE ISSUES

### A. Defendant's Request to Represent Himself During the Penalty Phase

One day before the penalty phase was scheduled to proceed, defendant filed a *Faretta* motion seeking to represent himself. The trial court found the motion to be untimely, reviewed it using the factors articulated in *People v. Hardy* (1992) 2 Cal.4th 86, and denied the motion. Defendant contends this amounted to reversible error. We hold the trial court's ruling was a proper exercise of its discretion to deny an untimely *Faretta* motion.

#### 1. Factual background

The *Faretta* motion at issue was the culmination of a long history of defendant's attempts to replace his attorneys. In November 2006, well before trial began in October 2007, defendant submitted a document the court deemed a motion to appoint new counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Defendant ultimately withdrew the motion, and he instead moved to be appointed as co-counsel for purposes of

challenging the validity of his Texas conviction if advisory counsel was appointed for that issue.

In February 2007, defendant filed a *Marsden* motion and a *Faretta* motion. As discussed in section II.A, *ante*, the court granted defendant's *Faretta* motion and appointed Exum as stand-by counsel. Defendant withdrew his *Marsden* motion.

In May 2007, defendant requested advisory counsel for purposes of assisting him in attacking the validity of his Texas murder conviction. In considering the motion, the court stated, "this all looks like just an effort of delay."

In July 2007, defendant filed a motion to withdraw his waiver of counsel and asked the court to reappoint counsel. The court granted defendant's motion and reappointed Scalisi and Exum as counsel.

In September 2007, defendant filed another *Marsden* motion. During a closed proceeding, defendant asserted he needed the assistance of an attorney barred in Texas; counsel also noted that defendant and counsel were having disagreements regarding trial strategy. The court denied the *Marsden* motion.

In October 2007, defendant filed a fourth *Marsden* motion. He asserted irreconcilable differences with counsel and asked the court to replace Scalisi. At the *Marsden* hearing, Scalisi and Exum asked to withdraw as counsel, stating defendant insisted they present an alibi defense that "would be a subordination of perjury and at a minimum fraud." The trial court denied the *Marsden* motion as well counsel's requests to withdraw.

In November 2007, counsel informed the court (and defendant confirmed) that defendant was instructing counsel not to argue for life without the possibility of parole during the

penalty phase. Instead, defendant wished to testify that he sought a death verdict in order to obtain additional resources on appeal.

Later that month, and prior to the closing arguments in the guilt phase, defendant filed another *Marsden* motion — his fifth. Defendant asserted that trial counsel had failed to interview alibi witnesses and had not sufficiently attacked his Texas conviction. The court denied the *Marsden* motion, noting that counsel's representation had been "more than adequate."

In December 2007, after the guilt phase had concluded and on the date of the bifurcated hearing on the prior-murder special circumstance, defendant indicated that he intended to file *Marsden* and *Faretta* motions if counsel did not move for a new trial following the penalty phase. Defense counsel also discussed with the court defendant's request that counsel not present any evidence in mitigation during the penalty phase. Defendant again stated that he intended to request that the jury impose the death penalty. Earlier that day, defendant had, despite counsel's advice, refused to dress in civilian clothes when appearing in front of the jury.

After the jury returned its verdict in the bifurcated hearing — and one day before the penalty phase was scheduled to begin — defendant asserted he wanted to represent himself. The court directed defendant to complete a standard form describing the disadvantages of representing himself, his understanding of the charges against him, and the court's advice against self-representation. The court then held a hearing to consider defendant's request.

Defendant informed the court he wished to represent himself for "the enrichment of appellate resources. I do not

agree with the defense counsel's strategy in the penalty phase, as I did not agree with them in the [guilt] trial phase. I feel that what I'm seeking to do in the penalty phase is in my best interest. I'm not seeking any delays or continuances. If this is granted we can move forward as scheduled." The trial court concluded the motion was untimely, considered the relevant factors, and denied the motion.

### 2. *Analysis*

A defendant has a federal constitutional right to self-representation if he or she voluntarily and intelligently so chooses. (*Faretta, supra,* 422 U.S. at pp. 835–836.) When a defendant makes a timely and unequivocal request for self-representation, and does so knowingly, voluntarily, and intelligently, a trial court must grant the defendant's request. (*People v. Windham* (1977) 19 Cal.3d 121, 127–128.) When a defendant's motion is untimely, the motion is "based on nonconstitutional grounds" (*id.* at p. 129, fn. 6) and it is "within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*" (*id.* at p. 124; see also *People v. Bloom* (1989) 48 Cal.3d 1194, 1220 [stating a "midtrial motion for self-representation did not have a constitutional basis"].)

"We have long held that a *Faretta* motion is timely if it is made 'within a reasonable time prior to the commencement of trial.'" (*People v. Johnson* (2019) 8 Cal.5th 475, 499.) In evaluating whether a *Faretta* motion is timely, we have contrasted motions "made long before trial" with motions "'made on the eve of trial.'" (*Ibid.*) The former are timely; the latter are not. (See *id.* at pp. 499–500.) When a motion falls "outside these two extreme time periods," a trial court must

evaluate whether it is timely based on "pertinent considerations [that] may extend beyond a mere counting of the days between the motion and the scheduled trial date." (*People v. Lynch* (2010) 50 Cal.4th 693, 723.) In the context of a capital case, we have held that a *Faretta* motion made after the guilt phase verdicts have been returned is untimely. (*People v. Hardy*, *supra*, 2 Cal.4th at pp. 193–195 [motion made seven days prior to commencement of penalty phase]; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1365 ["a motion made between trial of the two phases [of a capital trial] is untimely"]; *People v. Hamilton* (1988) 45 Cal.3d 351, 369 ["the penalty phase has no separate formal existence but is merely a stage in a unitary capital trial"].)

Here, defendant filed his *Faretta* motion after the guilt phase verdicts had been returned and the day before the penalty phase was scheduled to begin. The motion falls squarely into the category of motions we have deemed to be untimely. (*People v. Lynch, supra*, 50 Cal.4th at p. 722; *People v. Hardy, supra*, 2 Cal.4th at pp. 193–194.)[22]

Nevertheless, defendant asserts his motion was timely because he did not request a continuance and was prepared to

---

[22] The parties do not address what standard a reviewing court should apply in evaluating a trial court's determination that a defendant's *Faretta* motion was untimely. We have not directly addressed the issue. (See *People v. Johnson*, *supra*, 8 Cal.5th at p. 501.) As was the case in *Johnson*, "[w]e need not decide whether de novo review or a more deferential standard is appropriate, however, because defendant's claim fails under either standard." (*Ibid*.)

proceed with the penalty phase as scheduled. He contends that we have never explicitly held that a *Faretta* motion filed between the guilt and penalty phases is necessarily untimely, and he asks us to adopt a rule that a self-representation request is assumed to be timely if the defendant does not request a continuance or cause future delay.

We do not agree. The mere fact that a defendant does not request a continuance when filing a *Faretta* motion does not render the motion timely. We recently rejected the assertion that "even a belated [*Faretta*] request must be granted unless it would entail undue delay or interfere with the orderly administration of justice." (*People v. Bloom* (2022) 12 Cal.5th 1008, 1057.) We have repeatedly held that a *Faretta* motion made on the eve of trial or after commencement of the guilt phase is untimely, without regard to whether the defendant requested a continuance. (See, e.g., *People v. Wright* (2021) 12 Cal.5th 419, 280; *People v. Johnson, supra,* 8 Cal.5th at p. 499; *People v. Lynch, supra,* 50 Cal.4th at p. 722; *People v. Valdez, supra,* 32 Cal.4th at p. 102; *People v. Horton* (1995) 11 Cal.4th 1068, 1110; *People v. Clark* (1992) 3 Cal.4th 41, 99–100; *People v. Frierson* (1991) 53 Cal.3d 730, 742.)[23]

---

[23]    Defendant cites *People v. Nicholson* (1994) 24 Cal.App.4th 584 for the proposition that his motion was timely. The Court of Appeal stated in *Nicholson* that it had found "only two reported decisions in which the trial courts denied *Faretta* motions when the defendants were ready to proceed without a continuance," and that in both cases "the denials resulted in reversals." (*People v. Nicholson, supra,* 24 Cal.App.4th at p. 593.) *Nicholson* is readily distinguishable. There, the appellate court concluded that the *Faretta* motion in that case

Having concluded that defendant's *Faretta* motion was untimely, we evaluate the trial court's decision to deny defendant's motion for abuse of discretion. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 427; see *People v. Hamilton, supra,* 45 Cal.3d at p. 369.) In exercising its discretion, "the trial court should inquire into the defendant's reasons for the requests" and should consider factors including " 'the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*People v. Hardy, supra,* 2 Cal.4th at p. 195.) "A court abuses its discretion if it acts 'in an arbitrary, capricious, or patently absurd manner' " (*People v. Boyce* (2014) 59 Cal. 4th 672, 687) or "when its ruling 'falls outside the bounds of reason' " (*People v. Osband* (1996) 13 Cal. 4th 622, 666).

The trial court here properly considered the relevant factors when it denied defendant's untimely *Faretta* motion. The court found defendant's reasons for wanting to represent himself — to ask the jury to impose the death penalty in order to gain additional resources for his appeal — were not "compelling[,] . . . overwhelming or clearly pivotal." The court further found that counsel's representation of defendant was "excellent" and "well above the norm." It noted regarding

---

was *untimely* but that the trial court abused its discretion in denying the untimely motion because the defendants had not "asked for a continuance or otherwise suggested or expressed an intent to delay the proceedings . . . ." (*People v. Nicholson, supra,* 24 Cal.App.4th at p. 592.) *Nicholson* thus does not support defendant's assertion that a *Faretta* motion is timely so long as a defendant does not request a continuance.

defendant's "prior proclivity to substitute counsel" that he had represented himself during the proceeding "only one time previous, but it did last for quite some time."[24] It also found that the stage of the proceeding weighed against self-representation because although it was "not an overwhelming length, it's certainly a pivotal stage of the proceedings as far as, obviously, the penalty that the jury will impose." Finally, the court stated that it was "not a huge concern" but that if defendant needed to move or use exhibits there would be a "minor disruption" of the proceedings because defendant was restrained. The court acknowledged defendant's claim that there would be no disruption to the proceedings because he would not offer witnesses or exhibits or cross-examine any prosecution witnesses. Still, the court found there was "the portent of some disruption simply because of where we are in the nature of the proceedings." Taking all of these factors into account, the court denied defendant's *Faretta* motion.

We conclude the trial court did not abuse its discretion in denying defendant's untimely *Faretta* motion. The court considered the pertinent factors and reasonably concluded that they weighed against granting defendant's request. Defendant again asserts that the court abused its discretion because he did not request a continuance when he moved to represent himself.

---

[24] As the Attorney General points out, and as described above, defendant had filed *Marsden* motions on five prior occasions, and he threatened to do so on another. Defendant's "proclivity to substitute counsel" was thus an even stronger factor in support of denying his *Faretta* motion than the trial court appears to have believed. (See *People v. Hardy*, *supra*, 2 Cal.4th at p. 195.)

But although "the potential for delay and disruption is an important factor in the analysis," it is not "the only factor the court may consider. We see no reason why a court may not also consider, for example, whether the potential disruption is likely to be aggravated, mitigated, or justified by the surrounding circumstances, including the quality of counsel's representation to that point, the reasons the defendant gives for his request, and the defendant's proclivity for substituting counsel." (*People v. Buenrostro*, *supra*, 6 Cal.5th at p. 426; see also *People v. Smith* (2018) 4 Cal.5th 1134, 1182–1183.) Those are the precise factors the trial court considered here.

Although the court acknowledged defendant was not requesting a continuance, it also observed that defendant's counsel was "excellent," that defendant had some proclivity to substitute counsel (indeed, more of a proclivity than the trial court expressly acknowledged), that defendant's stated reason for representing himself — to seek the death penalty — was not "overwhelming," and that defendant's self-representation carried with it some potential for disruption based on the stage of the proceedings. We therefore conclude that the trial court's determination was not arbitrary, capricious, or so outside the bounds of reason as to render its ruling an abuse of discretion.

## B. Claims Regarding Jury Deliberations

### 1. Trial court's direction to jury to continue deliberations

Defendant asserts the trial court erred when it instructed the jury to continue deliberating during the penalty phase after the jury indicated it was deadlocked. Defendant contends the court's actions coerced a death verdict and violated section 1140 and his state and federal constitutional rights to due process, a

fair trial, and against cruel and unusual punishment. We hold the trial court did not err.

### a. Factual background

The jury retired to begin penalty phase deliberations on December 19, 2007, at about 2:30 p.m. Shortly after 3:00 p.m., the jury requested that Stalcup's direct examination and defendant's personal statement be read back. The jury was dismissed for the remainder of the day. The reading was provided the following day from 10:10 a.m. until shortly after 11:00 a.m. The jury resumed deliberations but recessed for the day at 12:05 p.m. due to a juror's illness. The next day, the jury deliberated from 9:30 a.m. until noon, at which time it broke for lunch and submitted a note stating, "We are deadlocked 11 to 1. What do we do from here?"

Outside of the jury's presence, the trial court stated it intended to bring the jury into the courtroom and inquire as to the number of ballots taken and the numerical breakdown of each ballot without referring to the verdicts represented. Defense counsel asked the court if it would inquire of the jurors whether they believed further deliberations would be productive. The court agreed, noting the jury had not deliberated very long.

The jury was brought into the courtroom and the judge inquired about the reported deadlock. The foreperson stated the jury had taken four ballots with splits of six-to-six, eight-to-four, ten-to-two, and eleven-to-one. The foreperson also reported that deliberations were "thick and heated." The court asked each juror whether further deliberations would be productive. The foreperson said, "I really don't think so." Six jurors responded "no." Another said "absolutely not." Three stated "probably

not." One juror answered "maybe." The court then excused the jury from the courtroom.

Defense counsel requested a mistrial, arguing the jury was deadlocked. The prosecutor requested that deliberations continue because the jury had not been deliberating long, and because some jurors indicated they believed that continued deliberations would "maybe" (or "probably not") be productive. The court denied defense counsel's mistrial motion, stating the jury had not spent sufficient time deliberating, especially compared to the one week it took the jury to reach a verdict in the guilt phase. Accordingly, the court ordered the jury to return on January 3, 2008.

The jury resumed deliberations on January 3. After deliberating for about two hours, the jury returned a verdict of death.

### b. Analysis

Defendant asserts the trial court violated section 1140 and coerced the jury into returning a death verdict when it directed the jury to continue deliberating. Neither contention has merit.

### i. Section 1140

Section 1140 states: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." Defendant contends the trial court violated section 1140 by instructing the jury to continue deliberations after the jury reported a deadlock,

by ignoring the poll of the jurors indicating a deadlock, and by inquiring into the numerical division of the jury.

Whether there is reasonable probability under section 1140 that the jury can agree upon a verdict is left to the discretion of the trial court, which may consider the length of the trial, the amount of evidence, and the complexity of the issues. (*People v. Rodriguez* (1986) 42 Cal. 3d 730, 775; see *People v. Rojas* (1975) 15 Cal. 3d 540, 546.) A trial court "abuses its discretion if it acts 'in an arbitrary, capricious, or patently absurd manner' " (*People v. Boyce*, *supra*, 59 Cal. 4th at p. 687) or "when its ruling 'falls outside the bounds of reason' " (*People v. Osband*, *supra*, 13 Cal. 4th at p. 666).

None of the factors defendant relies on indicate the trial court abused its discretion here. In *People v. Sandoval* (1992) 4 Cal.4th 155, the jury spent "about three full days" deliberating before indicating that it believed it was deadlocked. (*Id.* at p. 195.) When the trial court asked whether it was possible for the jury to reach a verdict, each juror replied "no." (*Ibid.*) The jury also informed the trial court, at the court's request, that it had divided six-to-six on two counts and five-to-seven on a third count. (*Ibid.*) The court directed the jury to continue deliberating, noting that "a little more time would not be unreasonable in light of the fact that the trial had lasted five months." (*Ibid.*) The defendant argued on appeal that the trial court had abused its discretion when it instructed the jury to continue deliberations. (*Id.* at p. 197.) We rejected that contention in light of the amount of time the jury had spent deliberating. (*Id.* at p. 198.)

Here, the trial court directed the jury to continue deliberating, noting that the jury had "not put in sufficient

time." Indeed, the record indicates the jury had deliberated for only about four hours over three days before it indicated it believed it was deadlocked. In light of the circumstances of this case, the trial court did not abuse its discretion by ordering the jury to continue deliberating after such a brief period. (See, e.g., *People v. Sandoval, supra*, 4 Cal.4th at pp. 194–197 [no abuse of discretion after jury deliberated for about three days]; *People v. Sheldon* (1989) 48 Cal.3d 935, 958–959 [no abuse of discretion after jury deliberated for about two days]; *People v. Rodriguez, supra*, 42 Cal.3d at pp. 774–777 [no abuse of discretion after jury deliberated for about 18 days].)

Nor do the jurors' responses to the trial court's inquiry about the utility of additional deliberations indicate the court abused its discretion. When asked whether they believed further deliberations could help to reach a verdict, six jurors answered "no," one said "probably not," one said "I really don't think so," three answered "probably not," and one answered "maybe." These responses did not foreclose the possibility of reaching a verdict, which was sufficient under section 1140 to support the trial court's direction to the jury that it continue deliberating. (*People v. Brooks, supra*, 3 Cal.5th at p. 89 [seven jurors indicating additional assistance from the court regarding deliberations "would, or might, be helpful" provided "an ample basis" to support court's determination under section 1140]; *People v. Sheldon, supra*, 48 Cal.3d at p. 959 [no abuse of discretion under section 1140 when "several" jurors "expressed the hope that further instructions from the court might assist in bringing about a verdict"].) Indeed, we have held that a trial court does not necessarily abuse its discretion in directing further deliberations even when all of the jurors believed further deliberations would not be productive. (*People v. Sandoval,*

*supra*, 4 Cal.4th at p. 196; *People v. Breaux*, *supra*, 1 Cal. 4th at pp. 317–320.) Considering the circumstances here, we cannot say the trial court abused its discretion under section 1140 when it directed the jury to continue deliberations.

Defendant's additional assertion — that the trial court ran afoul of section 1140 by inquiring into the numerical division of the jury — similarly fails. A trial court does not violate section 1140 by inquiring of the jury as to its numerical division. (*People v. Carter* (1968) 68 Cal.2d 810, 815.)

### ii. Coercion

Apart from his claim under section 1140, defendant contends the trial court coerced a verdict by requiring deliberations to continue. He points to the length of time the jury deliberated, the trial court having required the jury to return to deliberate after the Christmas and New Year holidays, the jurors' responses concerning whether they believed additional deliberations would be productive, and the court's inquiry into the numerical division of the jury deadlock. Such coercion, defendant alleges, violated his state and federal constitutional right to due process, right to a fair trial, and the prohibition against cruel and unusual punishment.

Whether a trial court has improperly coerced a jury is a separate, albeit related inquiry from whether the court abused its discretion under section 1140. A court must exercise its power without coercion of the jury so as to avoid displacing the jury's independent judgment " 'in favor of considerations of compromise and expediency.' " (*People v. Rodriguez, supra*, 42 Cal. 3d at p. 775; see *People v. Carter, supra*, 68 Cal. 2d at p. 817.) Whether coercion occurred depends on the facts and circumstances of each case. (*People v. Breaux, supra*, 1 Cal. 4th

at p. 320.) Coercion involves " 'a judicial attempt to inject illegitimate considerations into the jury debates [and] . . . appeal to dissenting jurors to abandon their own independent judgment of the case against the accused,' " by exerting " 'excessive pressure on the dissenting jurors to acquiesce in a verdict.' " (*People v. Bryant*, *supra*, 60 Cal. 4th at p. 462.)

There was no coercion here. The court did not exert undue pressure on the jurors to reach a verdict or make any remarks that could be interpreted as coercive. Rather, the court properly inquired of the jurors concerning their numerical division (*People v. Brooks*, *supra*, 3 Cal.5th at p. 92; *People v. Carter*, *supra*, 68 Cal.2d at p. 815) and whether further deliberations would be productive (*People v. Brooks*, *supra*, 3 Cal.5th at p. 89). The court determined the deliberations should continue given the amount of time that had elapsed and the individual jurors' responses regarding the potential that further deliberations would be productive. As noted above, the jury had deliberated for the equivalent of only about four hours before declaring it was deadlocked. It was not coercive for the trial court to require additional deliberations after such a brief period. (See, e.g., *People v. Sandoval*, *supra*, 4 Cal.4th at pp. 194–197; *People v. Sheldon*, *supra*, 48 Cal.3d at pp. 958–959; *People v. Rodriguez*, *supra*, 2 Cal.3d at pp. 774–777.)

Defendant asserts the trial court's direction to the jury to continue deliberating effectively told the jury the court would compel it to deliberate until a unanimous verdict was reached. Relying on a decision by the United States Court of Appeals for the Ninth Circuit, *Jiminez v. Meyers* (9th Cir. 1993) 40 F.3d 976, defendant contends the jury would have been pressured to reach a verdict in light of the trial court's directions. He argues it was "especially coercive" for the court to continue deliberations, thus

forcing the jury to return after the Christmas and New Year holidays.

Federal appellate court decisions are not binding on this court, although we may consider them for any persuasive value. (*People v. Brooks, supra,* 3 Cal.5th at pp. 90–91.) In any event, *Jiminez* is distinguishable from the facts of this case. In *Jiminez,* the Ninth Circuit held the trial court had impermissibly coerced the jury "by expressing approval of the ' "movement" ' toward juror unanimity." (*People v. Brooks, supra,* 3 Cal.5th at p. 91, quoting *Jiminez, supra,* 40 F.3d at pp. 980–981.) The trial court below did not communicate to the jury any approval of the jury's progression toward unanimity.

Nor was there anything inherently coercive about the trial court's decision to adjourn deliberations over the holidays and have the jury return on January 3. The court advised the jury during voir dire that the case would recess over the holidays if it had not concluded — and counsel agreed with this approach. If anything, the court's decision to have the jury return rather than pressuring it to reach a verdict immediately likely reduced the potential for any coercion. (Cf. *People v. Anderson* (1990) 52 Cal.3d 453, 469.) Finally, as defendant acknowledges, we have held it is not improperly coercive for a trial court to inquire into the numerical division of a jury. (*People v. Valdez, supra,* 55 Cal.4th at p. 160; *People v. Carter, supra,* 68 Cal.2d at p. 815.)

We therefore conclude that the court's directive to the jury that it continue deliberations did not coerce the jury's verdict. For the same reasons, we also reject defendant's claim that the trial court erred in denying defendant's request for a mistrial when the jury declared it was deadlocked. (*People v. Clark, supra,* 52 Cal.4th at p. 990 [motion for mistrial should be

granted " 'only when a party's chances of receiving a fair trial have been irreparably damaged' "]; *People v. Valdez, supra,* 32 Cal.4th at p. 128 [trial court's denial of mistrial motion is reviewed for abuse of discretion].)

> ### 2. *Trial court's inquiry into jury's numerical division during deliberations*

In addition to asserting that the trial court's inquiry into the numerical division of the jury amounted to improper coercion and violated section 1140, addressed above, defendant further contends the court's inquiry itself requires reversal of the death judgment.

As described, after a few hours of deliberations the jury sent the court a note that it was deadlocked; the note indicated the division was 11 to 1. The trial court stated that it intended to bring the jurors into the courtroom to "[f]ind out how many ballots they've taken over what time, and perhaps what the numbers are without asking them, of course, what number represents which side of the possible verdicts." Defense counsel asked whether the court would also ask the jurors if they thought further deliberation would be beneficial, stating, "We were just wondering if it's a hopeless situation, if they're hopelessly deadlocked, if we can, kind of, get a read on that." After an exchange with the prosecutor, the court stated, "[W]hy don't I plan on getting the information, and then I'll tell them to go back while I discuss it with the attorneys, and then we'll have them come back in for whatever direction I give them. Is that agreeable?" Defense counsel responded, "Yeah. That's fine." As described above, the jury then entered the courtroom and the trial court asked the foreperson how many ballots the jury had taken and for the number of votes at each ballot.

Defendant acknowledges that we have approved of a trial court's inquiry into the numerical division of a jury. (*People v. Valdez, supra,* 55 Cal.4th at p. 100, *People v. Carter, supra,* 68 Cal.2d at p. 815.) He asserts, however, that we should reconsider our precedent in light of the high court's decision to forbid the practice in federal courts pursuant to its supervisory powers, citing *Lowenfield v. Phelps* (1988) 484 U.S. 231 at pages 239 to 240 and *Brasfield v. United States* (1926) 272 U.S. 448 at page 450.

The Attorney General asserts the claim is forfeited because defense counsel failed to object. Defendant contends an objection was not required because it would have been futile given the case authority approving an inquiry into the numerical division of a deliberating jury. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) The claim does appear to have been forfeited. Defense counsel not only failed to object to the trial court's inquiry of the jury, but affirmatively agreed with the court's approach. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038 [finding defendant's state and federal claims related to trial court's scheduling of jury deliberations were forfeited because "[c]ounsel did not object to the court's approach. Counsel on both sides said they had 'no problem' with it"].)

Even assuming the claim was preserved, however, we reject it on the merits. As noted, we have previously considered and rejected the argument that it is error for a trial court to inquire into a jury's numerical split during deliberations. (See, e.g., *People v. Bryant, supra,* 60 Cal.4th 335, 462–463; *People v. Valdez, supra,* 55 Cal.4th at p. 100; *People v. Johnson* (1992) 3 Cal.4th 1183, 1254; *People v. Breaux, supra,* 1 Cal.4th at p. 319; *People v. Carter, supra,* 68 Cal.2d at p. 815.) Indeed, our

decisions have squarely addressed and rejected the federal cases on which defendant now relies. (*People v. Valdez, supra,* 55 Cal.4th at p. 100 [discussing and rejecting similar claim in light of *Brasfield v. United States, supra,* 272 U.S. 448]; *People v. Johnson, supra,* 3 Cal.4th at p. 1254 [discussing and rejecting similar claim in light of *Brasfield* and *Lowenfield v. Phelps, supra,* 484 U.S. 231].) Defendant provides no compelling reason for this court to revisit the issue.

## C. Instructions on Mercy and Lingering Doubt

Defendant asserts his state and federal rights to due process and the prohibition against cruel and unusual punishment were violated when the trial court denied defense counsel's request to instruct the jury on the role of mercy and lingering doubt in its penalty phase deliberations. We find no error.

The requested mercy instruction stated, "In deciding the appropriate punishment, the jury may consider mercy for the defendant in weighing the factors in aggravation and mitigation." The jury was instructed with CALCRIM No. 763, which incorporates section 190.3, factor (k) and directs the jury to consider "[a]ny other circumstance, whether related to these charges or not, that lessens the gravity of the crime even though the circumstance is not a legal excuse or justification. These circumstances include sympathy or compassion for the defendant or anything you consider to be a mitigating factor, regardless of whether it is one of the factors listed above."

No additional instruction was required. Defendant's assertion that "mercy" is a distinct concept from "sympathy" or "compassion" is unavailing. (See *People v. Boyce, supra,* 59 Cal.4th at p. 707.) " '[W]e have repeatedly rejected the claim

that omission of "mercy" from the jury instructions constitutes error.' " (*People v. Scully*, *supra*, 11 Cal.5th at p. 609; see also *People v. Silveria* (2020) 10 Cal.5th 195, 301.) The instruction allowing for consideration of sympathy and compassion permitted the jury to consider mercy. (*People v. Brown* (2003) 31 Cal.4th 518, 570; *People v. Stanley* (1995) 10 Cal.4th 764, 840 ["a jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed it may exercise 'mercy' "].) Defendant asks us to reconsider our prior decisions on this point. He offers no persuasive reason for doing so.

We also hold that the trial court did not err in declining to give defendant's requested instruction concerning lingering doubt. The proposed instruction stated:

> "Each individual juror may consider as a mitigating factor residual or lingering doubt as to whether the defendant killed the victim. Lingering or residual doubt is defined as the state of mind between beyond a reasonable doubt and beyond all possible doubts.

> "Thus if any individual juror has a lingering or residual doubt about whether the defendant killed the victim, he or she must consider this as a mitigating factor and assign it to the weight you deem appropriate."

We have repeatedly held that a trial court is not required under state or federal law to give such an instruction. (*People v. Ramirez*, *supra*, 10 Cal.5th at p. 1030.) And "no such instruction is necessary when — as here — the court instructed the jury on section 190.3, factors (a) and (k) and defense counsel urged the jury to consider residual doubt in closing argument." (*Ibid*.)

Defendant's assertion that *People v. Gay* (2008) 42 Cal.4th 1195 compels a contrary result is unavailing. In that case, this court reversed a death judgment when the trial court instructed the penalty phase jury on lingering doubt but limited evidence the defense could offer during the penalty phase. (*Id.* at p. 1224.) We held that "[t]he combination of the evidentiary and instructional errors present[ed] an intolerable risk that the jury did not consider all or a substantial portion of the penalty phase defense, which was lingering doubt." (*Id.* at p. 1226.)

Here, the trial court refused to instruct the jury specifically on lingering doubt but allowed counsel to argue lingering doubt. We have previously found no error occurred on similar facts. (*People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 326 ["In *Gay*, the trial court instructed the jury on lingering doubt, but precluded the defendant from presenting that defense; in the present case, the trial court allowed defendants to present and argue their lingering doubt defenses, but refused to specifically instruct on lingering doubt. As we stated in *Gay*, our holding there was not based on any state or federal constitutional right to a lingering doubt instruction; rather, it was based on California's death penalty statute, which authorizes the admission of evidence of innocence at a penalty retrial"].) Consistent with our prior approach, we find no error here.

### D. Whether the Jury was Required to Find Aggravating Factors Outweighed Mitigating Factors Beyond a Reasonable Doubt

Defendant asserts his state and federal right to due process, right to an accurate jury determination, and the prohibition against cruel and unusual punishment were violated when the trial court denied defense counsel's request to instruct

the jury that it had to find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. In support, he relies on *Apprendi v. New Jersey, supra*, 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584.

As defendant acknowledges, we have consistently rejected the argument that *Apprendi* and its progeny require the jury to find that aggravating factors outweighed mitigating factors beyond a reasonable doubt. (See, e.g., *People v. Merriman* (2014) 60 Cal.4th 1, 106; *People v. Duff, supra*, 58 Cal.4th at p. 569; *People v. Griffin* (2004) 33 Cal.4th 536, 595.) Defendant offers no persuasive reason for us to reconsider these precedents, and we decline to do so.

### E. Constitutionality of California's Death Penalty Law

Defendant advances several challenges to the constitutionality of California's death penalty law that, he acknowledges, this court has previously considered and rejected. We decline his request to reconsider our prior precedent regarding the following holdings.

"Section 190.2 provides a list of the special circumstances . . . which render a defendant eligible for the death penalty. These factors are not so numerous and broadly interpreted that they fail to narrow the class of death-eligible first degree murders as required by the Eighth and Fourteenth Amendments." (*People v. Schultz* (2020) 10 Cal.5th 623, 682.)

"Section 190.3, factor (a), directs the jury to consider as evidence in aggravation the circumstances of the capital crime. This has not resulted in the wanton imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments by permitting prosecutors to argue that the

various features of the murder, even features that are the converse of those in other cases, are aggravating factors." (*People v. Schultz, supra*, 10 Cal.5th at p. 683.)

Instructing the jury that a death verdict is "warrant[ed]" if the aggravating factors are " 'so substantial' " in comparison with the mitigating factors is not impermissibly broad or vague. (*People v. Scully*, *supra*, 11 Cal.5th at p. 611.)

"Use of adjectives such as 'extreme' and 'substantial' in section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence." (*People v. Johnson*, *supra*, 62 Cal.4th at p. 656.)

"Directing the jury to consider ' "whether or not" ' certain mitigating factors were present does not invite the jury to use the absence of such factors as a factor in aggravation." (*People v. Schultz, supra*, 10 Cal.5th at p. 684.)

"There is no federal constitutional requirement, either under the Fifth, Sixth, Eighth, or Fourteenth Amendments, that the jury make unanimous findings regarding the aggravating factors . . . ." (*People v. Schultz, supra*, 10 Cal.5th at p. 683; see also *People v. Scully*, *supra*, 11 Cal.5th at p. 611.)

The trial court need not instruct the jury during the penalty phase that it must impose life without the possibility of parole if it determines that mitigating factors outweigh aggravating factors. (*People v. Scully*, *supra*, 11 Cal.5th at p. 611; *People v. Frederickson, supra*, 8 Cal.5th at p. 1027; *People v. Jones, supra*, 54 Cal.4h at p. 78.)

"Jurors need not make written findings on the aggravating factors found." (*People v. Scully*, *supra*, 11 Cal.5th at p. 612.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*People v. Snow* (2003) 30 Cal.4th 43, 126.)

"The imposition of the death penalty under California's law does not violate international law or prevailing norms of decency." (*People v. Krebs* (2019) 8 Cal.5th 265, 351.)

Defendant acknowledges that this court has previously rejected the challenges to California's death penalty scheme that he presents here. He asserts, however, that our analysis of these issues is constitutionally defective because we have failed to consider their cumulative impact or to address the capital sentencing scheme as a whole. We have considered and rejected this identical cumulative impact argument in prior cases, and we do again here. (See, e.g., *People v. Amezcua and Flores* (2019) 6 Cal. 5th 886, 928; *People v. Johnson, supra,* 62 Cal.4th at pp. 657–658.)

## VI. CONCLUSION

We affirm the judgment in its entirety.


**CANTIL-SAKAUYE, J.\***


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

---

\*    Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Thomas

_____

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S161781
**Date Filed:** January 26, 2023

_____

**Court:** Superior
**County:** Riverside
**Judge:** Terrance R. Boren

_____

**Counsel:**

John L. Staley, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Robin Urbanski, Ronald A. Jakob and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John L. Staley
Attorney at Law
12463 Rancho Bernardo Road, No. 372
San Diego, CA 92128
(858) 613-1047

Michael D. Butera
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9054